### HARDEMAN *v.* STATE.

Jan. 5, 1953

No. 38567 14 Adv. S. 2 61 So. 2d 797

*Rupert Ringold* and *J. W. Conger,* for appellant.

*J. T. Patterson,* Assistant Attorney General, for appellee.

Roberds, J.

Appellant Hardeman, indicted for the murder of Dora Marie Houston, was convicted of manslaughter, and sentenced to a term of ten years in the state penitentiary.

He contends on this appeal, first, that the testimony did not justify the verdict of manslaughter; second, that the trial court erred in excluding from the jury part of a statement made by the victim, claimed by appellant to be a dying declaration; and, third, the lower court erroneously refused to grant to appellant certain specified instructions. We will pass upon these contentions in the order stated.

Did the testimony justify the verdict of manslaughter?

Hardeman and Dora Marie Houston both resided in that part of the town of Duck Hill, Mississippi, known as "Babylon". They lived some four hundred yards apart. Hardeman had been married and he had some children but he was separated from his wife and was living alone. Dora Marie Houston was married. Her husband was working at Rockford, Illinois. She had three children— two girls and a boy—who were living in the house with her. Leota West, an aunt of Fred Houston, the husband, was also living in the Houston home. The testimony of the State, in substance, is this:

Emma and Ida Houston, daughters of Fred and Dora Marie Houston, and Leota West, testified that about nine o'clock on Sunday night, March 9, 1952, Hardeman came to the Houston home, accompanied by a woman named Dorothy White. Dora Marie Houston was not at home. Hardeman wanted to borrow some money from Emma but she told him she did not have the money. He and Dorothy left. Later that night Hardeman alone came back to the Houston residence and inquired whether Dorothy White was there. She was not. He left. Between eleven and twelve o'clock he returned alone. Dora Marie was then at home. She was in her nightgown preparing to retire. Ironically she was singing "Good Night, Irene". Hardeman called to her to come out. She put on a skirt, waist and a coat and went out the front of the house. These witnesses heard no conversation between the two. The next thing they heard was a pistol shot. That was about two minutes after Dora went out of her room. Dora was on the ground near a woodshed to the rear of the house. She had been shot through the stomach with a pistol. A number of people quickly arrived. Dora was brought into the home and later carried to the Grenada Hospital at Grenada, Mississippi.

Willie B. Shaver testified she was the mother of Dora Marie Houston and lived in a house just to the rear of the

Houston home. She had retired. She heard the shot and then heard Dora Marie call for her. She immediately ran out in her night clothes. Dora Marie was on the ground and appellant was standing within two or three steps of her. Witness "shook" Dora Marie, who said nothing. Appellant immediately left, walking fast. Witness followed him, inquiring why he had shot her daughter. Appellant said nothing and continued to leave the scene. Other persons arrived and they carried Dora Marie into the house.

Dorothy White, 24 years of age, testified that she lived near the Houstons; that she saw Hardeman that Sunday morning at his home. She next saw him about nine o'clock that night at a cafe; that he asked her "where was that woman", meaning Dora Marie Houston; she replied she did not know. He then said he was going to her home and asked Dorothy to go with him, which she did. Dora Marie was not at home. Hardeman undertook, without success, to borrow a quarter from Emma Houston. Later she saw Hardeman and he again inquired "Have you seen that woman yet?" He then said "I am going to kill that woman". Witness remonstrated with him. She also told another person, apparently in the cafe, ". . . that Elbert said he was going to kill Miss Dora Marie and to take the pistol away from him." She then went home. Hardeman came to her house about 11:00 to 11:30 o'clock and called through the window to her to come out, which she did. He then inquired "Is that woman Dora Marie over here." She replied she was not. Hardeman then told her that Dora Marie's children had informed him she was not at home. Hardeman, apparently believing that the children had misinformed him, asked Dorothy to go to the home of Dora Marie and bring her to him. Witness assured Hardeman that if the children stated Dora was not at home that this was the truth. He then said "That's all right, if you don't want to go get her, I'll get her if it

be next Wednesday.'' He left. In about ten minutes she heard a pistol shot. People were running towards the Houston home. She went also. Dora Marie had been brought into the house. Witness rode in the automobile which carried Dora Marie to the hospital at Grenada.

Dr. W. E. Brown, connected with the Grenada Hospital, and Misses Pauline Blankenship and Frances Ayles, two nurses working therein, testified that Dora Marie Houston was brought to that hospital early Monday morning. The exact time is not shown. Apparently it was between one and two o'clock. They testified as to the pistol shot wound in the abdomen; the care and treatment they gave her and that she died from that wound about 4:15 on Tuesday morning following. The bullet wound was just to the left of the navel. In the absence of the jury they repeated some statements made by Dora Marie bearing upon the intentions of Hardeman when he shot her and the criminal nature of the act. These tended to exculpate him. However, the only statement relevant to the issue under discussion now is the one admitted by the court to go before the jury and that was ''We were playing.''

Mr. Winston Blakely testified he was marshal of Duck Hill at the time. He was called to the scene, where he was informed Hardeman had done the shooting. He went to Hardeman's home but he was not there. Later he returned and Hardeman was at home. He said this conversation was had between him and Hardeman:

''A. I asked him, I says, 'Did you shoot that girl?' and he says, 'Yes, sir,' and I says, 'What did you do with the pistol?' and he said he lost it going across Mr. Jeff Wilkins pasture.

''Q. Did he say what kind of pistol it was?

''A. Said it was a .32 automatic.

''Q. Did he make any further statement?

''A. He said he didn't intend to shoot her, said he intended to shoot through her coat and scare her.

"Q. Did he make any statement with reference to spending his money?

"A. Yes, sir.

"Q. What statement did he make?

"A. He said she was spending his money and doing him wrong." He arrested Hardeman and placed him in jail.

Mr. J. C. Sledge, operating a mercantile business in Duck Hill and who had known Hardeman for a number of years, testified that on Monday morning after this occurrence Sunday night, Hardeman called him over the telephone and asked Mr. Sledge to sign his bail bond. Mr. Sledge gave this account of the conversation: "A. He called me and said he wanted me to come down and make his bond. I says, 'What is the matter, Elbert?' and he says 'I shot a woman up there last night.' I says, 'What in the world did you do that for?' and he says, 'She was meddling in my business.' "

Fred Houston, the husband of Dora Marie, testified they were happily married; that they had three children —13, 14, and 16 years of age; that he was working in Rockford, Ill., because he could make more money there than at Duck Hill with which to support his wife and support and educate the children; that he sent money home each month; that he received a telegram notifying him of the tragedy and came immediately but his wife was dead upon his arrival.

That constitutes the evidence on behalf of the State.

The defense recalled Miss Frances Ayles and she was permitted by the court to tell the jury that a short time before the death of Dora Marie she said, in referring to the shooting, "We were playing."

The defendant then took the stand. He was 35 years of age; married but separated from his wife; had children, without stating the number or their whereabouts; said he was living alone; that he had been intimate with Dora Marie for two years; that on that Sunday, shortly

before sundown, he had seen Dora Marie and they had made an engagement for him to come to see her that night but that she said the children had visitors and he would have to come late; he did come about eleven or a little after; knocked on the door; that she dressed and came out; that they went to the rear of the residence, near the woodshed, with their arms around each other; that they started the act of sexual relations. He then described the shooting in these words: "Well, we was standing there, sir, with our arms around each other and the gun was right here in my belt, it wasn't under my shirt, just under my belt, and we was hugged up with each other and the gun slipped and she caught it, she put her hands on it first, the gun went back with the barrel part up that way (illustrating) and the magazine laying forwards, and she caught it and I did too, and just in a move the gun went off and she stood there a few minutes and she had this arm still over here, and she stood there just a second or so and says, 'You have shot me,' and I says, 'No, I haven't,' and she went to trembling and I helped her set down and held her hand until her mother got near there." He then left, intending to go to the home of his father, but changed his mind; that he jumped a ditch and lost the pistol and could not find it and then proceeded to his home, where he was arrested by Mr. Blakely, the Town Marshal. Apparently the pistol was never produced.

He denied that Willie B. Shaver said anything to him, as she had testified. He said he left the scene because he didn't know what she might do.

He denied that he had made any threats against Dora Marie as testified to by Dorothy White; denied he had been to the Houston home that night prior to the trip when the shooting took place; denied he had tried to borrow a quarter from Emma Houston; denied he had made to Mr. Blakely and Mr. Sledge the statements to which they testified, as heretofore quoted.

Defendant then introduced six character witnesses. Two of these were coemployees with Hardeman at a manufacturing enterprise located at Tie Plant, Mississippi. They said his reputation was good around the plant; they did not know his reputation in Duck Hill. Three said his reputation in Duck Hill was good. Two of these said the reputation of Dorothy White in Duck Hill was bad. Another witness, the mayor of the town, said he had never heard anything about Hardeman's reputation one way or the other.

That was the testimony. Was it sufficient to support a manslaughter verdict? Chapter I of Title II, Vol. 2, Miss. Code, 1942, defines various crimes. Section 2232, said Code, under the heading "Homicide—all other killings", provides that "Every other killing of a human being, by the act, procurement, or culpable negligence of another, and without authority of law, not provided for in this chapter, shall be manslaughter." The State, in the case at bar, proceeded upon the idea that the testimony herein justified the jury in concluding that Dora Marie Houston came to her death as the result of the culpable negligence of appellant. It then obtained this instruction:

"The Court charges the jury for the State that culpable negligence as mentioned in the instruction on manslaughter given by the court is that degree of negligence or carelessness which is denominated as gross, and which constitutes such as departure from what would be the conduct of an ordinary, careful and prudent person, under the circumstances, as to show indifference to consequences, so wanton and so reckless and in such a manner so as to evidence a disregard for the safety of human life." Appellant does not challenge the correctness of that instruction. See Robertson v. State, 153 Miss. 770, 121 So. 492; Smith v. State, 197 Miss. 802, 20 So. 2d 701; Hancock v. State, 209 Miss. 523, 47 So. 2d 833; Bass v.

State (Miss.), 54 So. 2d 259; Sullivan v. State, 213 Miss. 14, 56 So. 2d 93.

Mr. Blakeley, the Town Marshal, testified, as above noted, that appellant told him he intended to shoot through the coat Dora Marie was then wearing and scare her; that she was spending his money and doing him wrong. The jury had a right to believe that and very likely did believe it. That, with the other facts and circumstances shown herein, which the jurors had the right to believe, was entirely sufficient to constitute culpable negligence. Intent to kill was not necessary. Hancock v. State, supra. ■■■ Appellant argues that he was the only eyewitness and his version ought to have been accepted by the jury. We can understand the jurors thought the account given by appellant was unreasonable; besides, his veracity was gravely challenged by his denial of the many incriminating things the other witnesses testified he said. It was the duty and function of the jury to evaluate his, as well as all the other, testimony. The verdict of manslaughter was amply supported by the evidence.

We do not adjudge whether, taking as true what Mr. Sledge and Dorothy White testified appellant said to them, a murder verdict would have been justified, which would, or might, have included the crime of manslaughter. That is not before us. The State proceeded on the theory of culpable negligence.

On the second question raised by appellant, Dora Marie Houston made several statements before her death, tending to exculpate Hardeman. On preliminary hearing the learned trial judge excluded all of them which were uttered by her prior to the time she made the statement, about three hours before her death, "I am going home." Appellant argues that some of these utterances were competent. The contention is not wall grounded. ■■ There is no testimony whatever establishing that this woman realized death was impending prior to the time she

uttered the quoted phrase. In Lea v. State, 138 Miss. 761, 103 So. 368, this Court said: "A dying declaration is made without the sanctity of an oath and without an opportunity to cross-examine the declarant. To take the place of that sanctity and that right, there must be an undoubted belief in the mind of the declarant at the time the declaration is made that death is upon him. If it appear that he has any hope of recovery, however, faint, the required sanctity is not afforded, and the alleged dying declaration cannot be received." And the trial judge, in order to admit such a declaration, must believe beyond a reasonable doubt that declaration was made under realization and solemn sense of impending death. Such declaration should be admitted with great caution. Walton v. State, 156 Miss. 499, 126 So. 29; Conway v. State, 177 Miss. 461, 171 So. 16; Wilkinson v. State, 143 Miss. 85, 108 So. 711; Simmons v. State, 206 Miss. 535, 40 So. 2d 289. About three hours before she died she made the statement "I am going home." After that she said "We were playing and he would not have done it for anything intentionally." The court admitted to go to the jury the statement "We were playing." Of course that was upon the assumption she realized and appreciated her impending demise. The trial judge was somewhat liberal to defendant in doing that, for the statement "I am going home" is rather indefinite. Indeed, the nurses themselves were not certain what she meant by that. No one had intimated to her she was not going to live. There is grave doubt also whether she was rational when she made that statement. However, appellant, of course, does not complain at the admission of that statement to the jury. ▉▉ ▉ He does complain because the judge did not admit the rest of the statement—that is "he would not have done it for anything intentionally." In another place the nurse said that part of the statement was "You know he would not have done it for anything intentionally." The trial judge

thought these statements embodied conclusions or opinions and not facts. We think he was correct. Whether people knew he would not have done it intentionally or whether he would have done it intentionally, aside from what people knew or thought about it, could be no more than a belief or an opinion on the part of declarant. Such belief or opinion was not competent. Fulton v. State, 209 Miss. 565, 47 So. 2d 883.

As to the third contention, the court granted the State six instructions, including one on the form of the verdict. The defendant obtained twelve instructions, including one on the form of the verdict. He refused the defendant four instructions of which complaint is made on this appeal. We deem it unnecessary to copy and discuss in detail each of the four refused instructions. ██ ██ They either pointed out, directed attention to and emphasized certain aspects of the testimony given by particular witnesses, in such manner as to constitute a comment or charge upon the weight of the evidence, or they announced principles of law covered by the given instructions, or propositions inapplicable to the issues involved in this litigation. Section 1530, Mississippi Code, 1942.

We think appellant had a fair trial. His counsel were skillful and diligent in protecting his interests and the trial judge was unusually cautious in preserving his rights.

Affirmed.

*McGehee, C. J.,* and *Hall, Kyle* and *Ethridge, JJ.,* concur.