Emanuel PEA, Jr., Appellant,

v.

UNITED STATES of America, Appellee.

No. 20433.

United States Court of Appeals District of Columbia Circuit.

Argued April 18, 1967.

Decided Dec. 20, 1967.

Reargued En Banc Jan. 17, 1968.

On Rehearing En Banc June 19, 1968.

Burger, Danaher, and Tamm, Circuit Judges, dissented on rehearing.

Mr. Harold David Cohen, Washington, D. C., with whom Mr. J. Laurent Scharff, Washington, D. C. (both appointed by this court) was on the brief, for appellant.

Mr. Edward T. Miller, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., Frank Q. Nebeker and Allan M. Palmer, Asst. U. S. Attys., were on the brief, for appellee. Mr. Robert Kenly Webster, Asst. U. S. Atty., also entered an appearance for appellee.

Before BAZELON, Chief Judge, and McGOWAN and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge.

This opinion considers the voluntariness of appellant's confession of murder.

His case is before us for the third time. On a 1960 indictment appellant was convicted of first degree murder and sentenced to death, but in 1962 this court vacated the judgment and remanded for a new trial because appellant had been represented by a fraudulent imposter-lawyer.[1] A 1963 judgment of imprisonment for 15 years to life on a conviction of second degree murder was affirmed by this court,[2] but in 1964 the Supreme Court vacated our judgment and remanded for further proceedings not inconsistent with its opinion in Jackson v. Denno, decided that same day. 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908.

The evidentiary hearing on voluntariness of appellant's confession, given while he was in Sibley Hospital, was postponed at the request of defense counsel, who had to contact medical witnesses who had left the country. The trial judge was hospitalized at the time the hearing was held in 1966 and the case was transferred to another judge for disposition.

In Part I of this opinion we quote substantially the entire opinion of the District Judge rendered July 8, 1966, which presents background facts and concludes that the prosecution has shown appellant's confession to be voluntary. In Part II of this opinion we explain why in our view the District Court's ruling must be reversed for failure to apply requisite criteria of voluntariness. A further aspect of the case is reserved for en banc consideration.

## I.

### The District Court's Opinion that Appellant's Confession Was Voluntary.

What follows is substantially the entire opinion of the District Judge:

"At the July 1, 1966 hearing, Edwin Coppage, an officer of the Homicide Squad, Metropolitan Police Department, and the defendant appeared as witnesses. Also appearing by deposition was Dr. Carlos Mena. There were received in evidence at the hearing defendant's Exhibit No. 1, being the record of Sibley Memorial Hospital concerning defendant's admission on June 28, 1960 and defendant's Exhibit No. 2, the record of District of Columbia General Hospital with respect to the admission and treatment of the defendant between June 28, 1960 and his discharge from said hospital on August 1, 1960.

"Detective Coppage testified that he had been a member of the Homicide Squad of the Metropolitan Police Department since 1953. On the night of June 28, 1960 he responded to a police call to go to the Unit Block of Eye Street, N.W. At 10:45 P.M. he arrived at 66 Eye Street, N.W. where he saw lying on the ground a Negro female who was

---

1. Pea v. United States (No. 16387, July 11, 1962).

2. Pea v. United States, 116 U.S.App.D.C. 410, 324 F.2d 442 (1963).

bleeding from the head. There he met several officers from the First Precinct of the Metropolitan Police Department. Private Harold Cook of that precinct advised Detective Coppage that the female had been shot and that a suspect had been taken to Sibley Memorial Hospital. Private Cook had the gun used in the shooting. Coppage went immediately to Sibley Memorial Hospital, which at that time was located at North Capitol and M Street, N.W., approximately 3½ blocks from 66 Eye Street, N.W.

"Detective Coppage arrived at Sibley Memorial Hospital around 10:53 P.M. At the time he arrived he did not know the circumstances of the shooting or any of the circumstances which had preceded the shooting. He went directly to the emergency room in the hospital and there he found a physician, two nurses, two police officers and a patient who was on a table. The physician was a Dr. Tan.[3] The patient was the defendant. At the time Coppage entered the emergency room Dr. Tan was standing alongside the defendant taking his blood pressure. When Dr. Tan completed taking the blood pressure Detective Coppage asked the former if he could talk to the defendant and Dr. Tan advised him that he could do so. Coppage went to the table on which the defendant was lying and observed he had a gauze covering on the upper part of his head as well as one eye.

"Standing two feet from defendant's face, Coppage conversed with him after first advising that he was a police officer. From this conversation he learned that defendant resided on K Street. Defendant informed Detective Coppage that he had shot his wife and thereafter shot himself. The defendant related he had been separated from his wife and that on the evening of June 28, 1960 he obtained a car from the Star Pontiac Company and drove it to his wife's home. The defendant, his wife and their children drove to Virginia and visited with friends. On returning to the District of Columbia they stopped at a place that prepared food to take out and there defendant had bought some french fried potatoes. Thereafter they returned to Eye Street where defendant stopped the car and attempted to persuade his wife to return to him. Upon her refusal to do so and with the statement that she did not want to talk to him any further about the matter, she got out of the car. Immediately thereafter the defendant got out of the car and saying "die and be damned", shot his wife several times with the result that she fell to the ground. Immediately the children began to cry and this upset the defendant. He then shot himself in the head.

"Detective Coppage's entire conversation with the defendant lasted no more than five minutes, during which Coppage asked only several questions requiring a yes or no answer. The rest of the conversation was stated in narrative form by the defendant. Coppage and the defendant were speaking in normal tones and during the entire conversation Dr. Tan, two nurses and the two other police officers remained in the emergency room, which was 18 feet × 40 feet in size.

"Throughout the conversation the defendant appeared to Coppage as being coherent and he had no trouble talking. Detective Coppage smelled no alcohol on the breath of the defendant; he did not show any evidence of pain; and at no time did defendant state that he did not want to talk. Defendant's speech at all times was normal and no medication was administered to defendant during the five minute conversation. At no time during the conversation did Detective Coppage notice anything out of the ordinary in defendant's breathing. As stated

---

3. "Dr. Tan is no longer in the District of Columbia, but at the hearing counsel for the defendant advised that he had located Dr. Tan in the Philippine Islands; that he had transmitted to Dr. Tan the records of the Sibley Memorial Hospital and thereafter he learned that Dr. Tan had no recollection separate from the record of what transpired at Sibley Memorial Hospital." [Footnotes have been renumbered to conform to the sequence of this opinion.]

above, Detective Coppage knew nothing of the events that had transpired before and learned of them from defendant.

"Following Detective Coppage's conversation with the defendant the former inquired of Dr. Tan if the defendant could be moved to D. C. General Hospital where there were facilities for placing an arrested person under guard, which facilities did not exist at Sibley Memorial Hospital. Dr. Tan then again took defendant's blood pressure and approved the transfer to D. C. General Hospital. He stated he preferred the defendant be moved in an ambulance rather than in a police patrol wagon.

"Detective Coppage then called for the Fire Department's ambulance and when it arrived defendant raised himself on the table to a sitting position from which he was helped to a stretcher by the ambulance attendants. Coppage, at the request of the ambulance attendants, rode in the ambulance to D. C. General Hospital, arriving there between 11:30 and 11:45 P.M. During that trip defendant lay quietly.

"Upon arrival at D. C. General Hospital defendant was immediately moved to the emergency room and there placed on a table where four doctors began examining him. Detective Coppage did not listen to the doctors but instead went out of the emergency room to advise the police officer regularly stationed at D. C. General Hospital of the arrival of the defendant. Some minutes later Detective Coppage returned to the emergency room where he observed the doctors questioning the defendant and that the defendant was having trouble answering their questions making it difficult for the doctors to understand him.

"The Sibley Memorial Hospital record shows that on June 28, 1960 at 10:50 P.M. a physical examination of the defendant revealed presence of a gun shot wound in the right temple. That record states that the defendant was conscious, ambulatory and coherent. The right eye was devoid of vision, was swollen, tender and painful. Palpitation revealed tenseness and evidence of fluid in the socket of the right eye. The record is signed by Dr. Tan and in it he further stated that Dr. L. Williams was notified who in turn suggested calling a neurosurgeon. Defendant's blood pressure was 130/80 and his pulse was 60. Dr. Tan further stated in the record made by him that, upon inquiry by police officers as to whether it would be safe to remove defendant to D. C. General Hospital, he concluded that defendant could withstand the trip and that he was to be conducted to D. C. General Hospital by ambulance.

"The D. C. General Hospital record received in evidence revealed that defendant arrived at D. C. General Hospital at 11:40 P.M. on June 23, 1960. Upon physical examination a small gun shot wound was discovered in the right temporal area of defendant; that his right eye was affected with no light perception; with his left eye defendant could see light and could differentiate objects; that a neurosurgeon's examination revealed nothing significant. A skull X-ray made at D. C. General Hospital revealed the trace of the bullet from the right temporal region across the middle line and shows the bullet in the left orbit, more medial than latteral. Upon arrival the defendant was conscious and alcohol odor was detected. Upon admission he was very confused and the only history obtained from him at the time was that he inflicted a head wound upon himself and that he was unable to see. The resident neurosurgeon reported that on his examination the defendant was conscious and talked coherently. The neurosurgeon resident detected an alcohol odor.

"Dr. Carlos Mena was the chief resident in neurosurgery in D. C. General Hospital on June 28, 1960 and at least until August 1, 1960 when defendant was discharged from the hospital. He now practices neurosurgery in Honduras. On September 29, 1965 he gave his deposition for the purpose of this hearing. Counsel for the Government and counsel for the defendant read into the record those parts of the deposition they desired to have considered as part of the evidence. Dr. Mena's deposition discloses

that he examined the defendant about one or two o'clock in the morning of June 29, 1960. At that time he found the defendant to be lethargic and intoxicated. The defendant's blood pressure, pulse and respiration were normal; he was not in a state of shock. The defendant was conscious, could answer questions yes or no, but he could not talk fluently. Dr. Mena also testified that the X-ray revealed a bullet in the right temporal area and that it destroyed the right optic nerve. While the defendant had suffered a concussion, no damage was done to the defendant's brain by the gun shot wound. At the time that Dr. Mena gave his deposition he stated that the concussion could have produced headaches and amnesia, but his testimony did not state that the defendant had actually suffered from either. Dr. Mena also testified that as a result of intoxication and concussion the defendant was in a state of lethargy, but that he could answer yes or no to any questions put to him. Dr. Mena expressed the opinion that defendant would be indifferent as to protecting himself with respect to any question.

"Defendant testified at the hearing that he could not remember being in Sibley Memorial Hospital nor of having seen Detective Coppage until the Coroner's inquest sometime after he was discharged from D. C. General Hospital.

"It would appear from the evidence that sometime after defendant arrived at D. C. General Hospital he was in a confused state and had difficulty in making himself understood, although in that connection it is to be noted that Dr. Mena's "Admitting Notes" (Defendant's Exhibit 2) stated that defendant was conscious and could "talk coherently" when Dr. Mena examined the defendant around one or two o'clock in the morning of June 29, 1960. But it was defendant's condition

at Sibley Memorial Hospital when he made his confession that is critical here. It was approximately one hour after defendant confessed at Sibley that he arrived at D. C. General Hopital.

"The evidence stands uncontradicted that between 10:53 P.M. and 11 P.M. on June 28, 1960, defendant gave a detailed oral statement of how and why he shot his estranged wife. This confession was made to Detective Coppage who, until informed by defendant, knew nothing of the circumstances of the fatal shooting of the wife or of defendant's self inflicted wound. Immediately before Coppage talked to defendant a physician at Sibley had examined him and approved of Coppage conversing with defendant. Again immediately after the confession the physician examined defendant and approved of his transfer by ambulance to D. C. General Hospital. While at Sibley Hospital defendant was ambulatory, conscious and coherent. His physical strength was sufficient to enable him to raise himself to a sitting position on the table where he had been lying while being examined and at the time he confessed. I find beyond a reasonable doubt that defendant at the time he confessed the killing of his wife was physically and mentally competent to make his confession and that he did so voluntarily.[4]

"This opinion shall serve as findings of fact and conclusions of law on the question of the voluntariness of defendant's confession."

## II.

### Significance of Medical Testimony on Issue of Voluntariness

1. The findings and opinion of the District Judge are sufficient to establish that appellant was apparently coherent at the time of his confession, and that the

---

4. "I make the finding of voluntariness and competency beyond a reasonable doubt although there is no authority in this jurisdiction requiring such standard of proof. Nor does Jackson v. Denno, 378 U.S. 368 [84 S.Ct. 1774, 12 L.Ed.2d 908] (1964) declare that such shall be the

standard of proof. However, in the Fourth Circuit case of United States v. Inman, 352 F.2d 954 (1965), it was held that a District Judge must be convinced beyond a reasonable doubt that the confession was voluntary."

detective conducted a relatively brief interview, while others were in the room. This case does not have the stigmata normally encountered in cases where voluntariness is an issue, and the detective's conduct was generally reasonable in the light of the situation as it appeared to the officer—with the important exception discussed below that he did not warn the arrested suspect that his statements might be used against him.

We also accept what is implicit in the findings of the District Judge that at the time of his confession appellant had cognitive understanding of what he had done, and that there are no indicia that his confession was not a reliable and trustworthy account of what happened.

■ More is required, however, to show that a confession is voluntary. It must be shown that in fact the confessor had a free will and intellect whether or not the detective had any reason to doubt its presence or suspect its absence.

■ Plainly the free will and intellect requisite under constitutional standards for admissibility of a confession would be negatived if it were shown that appellant had taken a "truth" drug. This was made clear by Chief Justice Warren in Townsend v. Sain, 372 U.S. 293, 307–309, 83 S.Ct. 745, 754, 9 L.Ed.2d 770 (1963):

> Numerous decisions of this Court have established the standards governing the admissibility of confessions into evidence. If an individual's "will was overborne" or if his confession was not "the product of a rational intellect and a free will," his confession is inadmissible because coerced. These standards are applicable whether a confession is the product of physical intimidation or psychological pressure and, of course, are equally applicable to a drug-induced statement. It is difficult to imagine a situation in which a confession would be less the product of a free intellect, less voluntary, than when brought about by a drug having the effect of a "truth serum." It is not significant that the drug may have been administered and

the questions asked by persons unfamiliar with hyoscine's properties as a "truth serum," if these properties exist. Any questioning by police officers which *in fact* produces a confession which is not the product of a free intellect renders that confession inadmissible. The Court has usually so stated the test. See, e. g., Stroble v. [State] California, 343 U.S. 181, 190 [72 S.Ct. 599, 603, 96 L.Ed. 872]: "If the confession which petitioner made * * * was in fact involuntary, the conviction cannot stand * * *." And in Blackburn v. [State] Alabama, 361 U.S. 199 [80 S.Ct. 274, 4 L.Ed.2d 242], we held irrelevant the absence of evidence of improper purpose on the part of the questioning officers. There the evidence indicated that the interrogating officers thought the defendant sane when he confessed, but we judged the confession inadmissible because the probability was that the defendant was in fact insane at the time. [Emphasis in original. Footnotes omitted.]

In Blackburn v. State of Alabama, 361 U.S. 199 at 207, 80 S.Ct. 274 at 280, 4 L. Ed.2d 242 (1960), the Court had said:

> In the case at bar, the evidence indisputably establishes the strongest probability that Blackburn was insane and incompetent at the time he allegedly confessed. Surely in the present stage of our civilization a most basic sense of justice is affronted by the spectacle of incarcerating a human being upon the basis of a statement he made while insane; and this judgment can without difficulty be articulated in terms of the unreliability of the confession, the lack of rational choice of the accused, or simply a strong conviction that our system of law enforcement should not operate so as to take advantage of a person in this fashion.

However in Townsend v. Sain, the Court expressly ruled that the reliability of a confession under drugs would not permit its use. There was still the dominant objection that the fundamental fairness conceptions of due process pre-

clude use of such a confession. On Townsend's claim that his confession had been obtained while he was under the influence of scopolamine (also known as hyocine),[5] often referred to as a "truth serum," the Supreme Court expressly stated (supra, 372 U.S., at 309 n. 5, 83 S.Ct. at 755)—

> [W]hether scopolamine produces true confessions or false confessions, if it in fact caused Townsend to make statements, those statements were constitutionally inadmissible.

Appellant was not under the influence of a truth drug. But his condition was its equivalent, so far as effect on free will is concerned, according to a description of appellant's condition contained in the testimony on deposition of Dr. Mena, the chief resident in neurosurgery at D. C. General Hospital who examined appellant shortly after the confession. Dr. Tan, who examined appellant at Sibley Hospital had no recollection of the incident. Before referring to Dr. Mena's testimony we wish to commend the Government for its cooperation in obtaining his testimony. It appears that his deposition is available only because the Government paid the difference in fare that permitted Dr. Mena to stop over in Washington in September 1965 rather than return directly to Honduras from a world conference of neurosurgeons in Europe which he attended as vice-president of the World Federation of Neurology.

Since Dr. Mena testified after referring to the record of D. C. General Hospital (Dft. Exh. 2,[6] we may first take note that the Emergency Treatment Record contained the hand-written Doctor's Admitting Notes, including his Neurosurgery Note written by Dr. Mena:

> Pt. conscious—alcohol odor.—Pt. can talk coherently.[7]

The testimony of Dr. Mena establishes that appellant was intoxicated and lethargic when examined by him. Although he was conscious, and his blood pressure, pulse and respiration were normal, there was some bleeding, although not water blood, and both eyes "were very swollen and edematous * * * [with] sign of big hemorrhage, especially the right eye." He could see nothing with his right eye, and only a little light with his left eye. The x-ray showed that the bullet had destroyed the right optic nerve, and become implanted in the middle of the skull. There was no brain damage but small pieces of bone and of bullet were sprayed over the sinuses. He "definitely" had a concussion from the impact of the bullet, which means, as Dr. Mena testified—

> that the person at that moment, and even the next day, cannot be normal, in a normal condition. That means that we call this syndrome of concussion, that is, little confused and lethargic. He can have some headache. * * He can have amnesia, some kind of injury, concussion.

Dr. Mena was asked what kind of attitude appellant would have if he were asked questions, what type of reply he would give. Dr. Mena answered:

> I would put altogether the state of intoxication I mentioned, first the in-

---

5. A police physician had administered this and other drugs for the purpose of alleviating the withdrawal symptoms being experienced by Townsend a narcotics addict (372 U.S. at 299, 83 S.Ct. 745, 9 L.Ed.2d 770). As stated in the excerpt quoted above, the Court deemed it without significance that the "truth serum" properties were not known to the person administering the drug or the questioner.

6. It was stipulated that the hospital records were admitted for any purpose deemed correct by the court.

7. There is also an apparently earlier Clinical Record, handwritten by a different physician, who is not called as a witness, which states:

> History of Present Illnesses
> Pt. is a 28-yr. old c. m. who, while intoxicated, killed his wife with a shot gun on the night of admission and then inflicted a head wound upon himself.
> On admission pt. is conscious, has strong order of alcohol on his breath, and is very confused. Unable to obtain any history from patient except that since he inflicted the head wound he has been unable to see.

toxication I mentioned, then the concussion. So he was in a state of lethargy, lethargic; so it is a state that he doesn't care anything. He can answer yes or no to any question that somebody asks * * * *he was indifferent to protect himself or not to protect him.* [Emphasis added.]

■ The medical testimony of Dr. Mena was uncontradicted. The defendant's condition of concussion, with a bullet lodged in his head, left him coherent but lethargic, not normal—and indifferent to protecting himself! In such condition does he have free will and intellect? Is he essentially different from the man who speaks coherently and truthfully, but under the impetus of a truth serum?

A man's free will and intellect necessarily embrace a freedom of choice.[8] Whether a man may speak out at a given time, and what he may say, reflect the tension of manifold forces within him, some moving him to speak, others to refrain from speaking. The number and quality of these forces are as complex as the emotions, ego and conscience of man. The statement, if any, that is the resultant of these forces will depend on the kind of stimuli before him and the kind of person he is, but whether he is noble or ignoble, in general or on the particular occasion, his statement reflecting his freedom of choice, his free will and free intellect, is admissible in evidence against him. As distinguished from inanimate evidence a testimonial statement, whether made at or before trial presents the unique evidentiary contribution of "an individual human personality whose attributes of will, perception, memory and volition interact to determine what testimony he will give." Smith and Bowden v. United States, 117 U.S.App.D.C. 1, 3, 324 F.2d 879, 881, (1963).

■ The make-up of a free man includes his mechanisms for self-preservation, to refrain from speech that may endanger him. If he does speak out his statement is admissible as the reflection of his free will if his self-preservation mechanism, and its impetus to silence, is overridden by pressures within his own personality, by his own conscience, religious feelings, sense of duty, etc. But his statement does not reflect his own free will or intellect if his statement is attributable in critical measure to the fact that his self-protective mechanism is negated or overridden by external force or fraud, a condition of insanity, the compulsion of drugs. And we think it manifest that his free will is likewise negatived if his statement reflects the concussion of a bullet shattering in his head, leaving him with the external appearance of coherence, but devoid of his normal will to protect himself and rendered indifferent to protect himself.

The District Judge reviewed the physical attributes of appellant's condition, making inferences favorable to the prosecution.[9] He referred to but did not focus on the significance of Dr. Mena's testimony concerning defendant's indifference to protecting himself, testimony that stands uncontradicted on this record. If the conclusion of the District Judge that the prosecution had established the confession to be voluntary reflects a failure to appreciate the constitutional significance of appellant's condition as reported in that testimony, it cannot stand.

---

8. The constitutional right to due process and the privilege against self-incrimination embrace "the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will," Malloy v. Hogan, 378 U.S. 1, 8, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964).

9. For example, the District Judge noted that the record states appellant was, inter alia, "ambulatory." That word indeed, appears in the Sibley record, as an inser-

tion. All the testimony shows is that appellant raised himself from a prone position on a table, and turned his legs around; the fireman and doctor got on each side of him and laid him on the stretcher alongside the table. Dr. Tan insisted that appellant be moved from Sibley Hospital to D. C. General Hospital in an ambulance rather than the police wagon. Dr. Mena's admitting notes at D. C. General Hospital merely stated that appellant "can move all extremities."

We note that at one point the District Judge commented that the critical question is the determination of appellant's condition at Sibley—one hour prior to his arrival at D. C. General Hospital, and two hours prior to the examination by Dr. Mena. However, the District Judge did not find that the condition found by Dr. Mena—that appellant was left indifferent to protecting himself by reason of the concussion together with the intoxication—was not in existence at Sibley Hospital. The concussion was obviously present at Sibley since it resulted from the gun wound—and the prosecution offered no medical evidence that its impact would have been of less significance at Sibley than an hour later. Dr. Mena characterized the effect of a concussion as "immediate." As to appellant's intoxication, the D. C. General Hospital record shows a strong odor of alcohol on appellant's breath. The detective who accompanied appellant was able to state of his own knowledge that appellant drank no alcoholic beverage during the interval between Sibley and arrival at D. C. General Hospital. There is no indication by the District Judge that the mere negative testimony of the detective, that he detected no odor of alcohol at Sibley, was taken to override an impartial and objective hospital record,[10] so as to satisfy the heavy burden resting on the prosecution to establish voluntariness.

Nor can the District Court's finding of voluntariness be supported on the ground that Dr. Mena's testimony was inapplicable in view of the detective's testimony that at Sibley appellant talked "coherently." As we have already pointed out, Dr. Mena's testimony as to appellant's condition was rendered after he had reviewed the D. C. General Hospital record which contains his admitting notes, reflected in the District Court's opinion: "Pt. conscious—alcohol odor.—Pt. can talk coherently." [11]

In view of the lack of a finding that appellant's condition at Sibley was different from that reflected in Dr. Mena's testimony, we must take the conclusion of the District Court as failure to appreciate the constitutional significance of that testimony, and must accordingly reverse.

■ 2. Appellant argues that the "totality of circumstances"—including but not limited to appellant's head wound—requires a conclusion that the confession was not voluntary. Thus appellant's counsel urges us to take into account the fact that appellant was a Negro of only 9th-grade schooling, and that the uncontradicted trial testimony of the chief psychologist at St. Elizabeths related that at some time in the past appellant had suffered organic brain damage, and that he functioned when tested "as a mental defective of moderate degree," with an I.Q. of 69, the top of the moron group. It is doubtful whether these facts were brought to the attention of the hearing judge.[12] Accordingly we are not disposed to rely on them, just as we did not place any reliance in our opinion on the fact that at the coroner's inquest the detective testified he had to cease questioning appellant "due to his condition." Although voluntariness is a matter to be determined on the whole record, it is not

10. At the trial a police officer testified that appellant was dazed at the time he was arrested. A whiskey bottle was found at his feet. A bystander testified that appellant had been drinking just after the shooting. Appellant testified that he had been drinking since that afternoon.

11. In his testimony Dr. Mena stated that appellant could talk, but not fluently. Although Dr. Mena was aware that appellant could talk coherently he testified clearly, and without contradiction, that in his view appellant was not normal ("can-

not be normal"), and that the concussion syndrome, which included lethargy, when added to his intoxication, left appellant "indifferent to protect himself."

12. The judge announced at the start of the hearing that he was not going to read all of the trial transcript and the hearing should be conducted like a trial de novo. Presumably, however, he would have permitted the reading in evidence of trial testimony. As already noted he permitted the reading in evidence of Dr. Mena's deposition.

unreasonable for a hearing judge to require counsel to identify the portions of the prior record they request be taken into account.

A question of a different nature is posed by the detective's failure to testify that he advised appellant of his right to remain silent. In our 1963 opinion we expressly commented that the record did not show that the detective warned appellant as "we might have expected." The Supreme Court pointed out in Davis v. State of North Carolina, 384 U.S. 737, 740, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895 (1966), that the fact that a defendant was not warned of his rights "is a significant factor in considering the voluntariness of statements later made * * * [and] gives added weight to the other circumstances described below which made his confession involuntary."

The general requirement for a warning of constitutional rights before questioning an arrested person is underscored in the case of a man in the hospital with a bullet wound in his head.[13] It is patent that such a man's defenses are down if not out; and the warning might at least offset impairment of his self-preservation mechanism. Assuming he has a minimum awareness which permit some questioning, without injury to health,[14] there can be no similar assumption that a man in such condition would understand that his statement could be used against him, leaving him free to "choose to speak in the free and unfettered exercise of his own will." [15]

■ Plainly the judicial determination of voluntariness vel non must take into account the constitutional signifi-

cance not only of the medical testimony concerning defendant's indifference to self-protection, but also of the lack of warning.

### III.

### Extent of Prosecution's Burden of Proof

We cannot stop with the reversal of the District Court's order but must address ourselves to the issue of the extent of the prosecution's burden of proving voluntariness. The District Judge, taking note of United States v. Inman, 352 F.2d 954 (4th Cir. 1965), found that voluntariness had been established beyond a reasonable doubt. If that is the appropriate standard, we are clear that on the record before us it cannot fairly be found beyond a reasonable doubt that the confession was voluntary, and a new trial must be held without introducing the confession in evidence.

Appellee argues, however, that the correct standard, under Clifton v. United States, 125 U.S.App.D.C. 257, 371 F.2d 354 (1966), is whether the confession is "established to the satisfaction of the court" as a voluntary one. Pressing for affirmance, appellee urges that the District Court's determination of voluntariness can be upheld if the record would support a finding of voluntariness under the lesser standard of *Clifton.* We reject this contention. We are not engaged here in an appellate reevaluation of evidence, and in reversing the District Court's determination we are mindful of the requirement that its findings of fact be sustained unless "clearly erroneous." The error of the District Court lay in failure to appreciate the constitution-

13. In 1958 the U. S. Attorney for the District lectured police officers regarding suspect interrogation in a hospital, instructing the police to give advice of constitutional rights and stating further: "You must satisfy yourself that the man who is being questioned is not under sedation, is not drunk, that he hasn't been hit on the head—in other words, that he knows what he's doing and his action is a voluntary act." Reprinted in Hearings on H.R. 11477 et al. Before a Subcommittee of the Senate Committee on the Judiciary, 85th Cong., 2d Sess. 411 (1958).

14. The detective testified that Dr. Tan said it was all right for the detective to talk to appellant. Dr. Tan had just finished taking appellant's blood pressure—which as we know was normal. Presumably Dr. Tan's remark meant that questioning would not worsen appllant's condition.

15. Malloy v. Hogan, 378 U.S. 1, 8, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

al significance of appellant's helpless state as revealed by medical testimony unrebutted by any record evidence. We cannot presume as a matter of law that the District Court, in the light of a proper evaluation of the constitutional significance of the medical testimony would have found the confession voluntary had it applied a *Clifton* standard.

It thus appears that the disposition of this case, including an appropriate direction to the District Court in case of remand, will depend on whether the prosecution's burden of proof is governed by an *Inman* standard or a *Clifton* standard. *Clifton* was decided without a dissent because of voluntariness hearing had been held prior to Jackson v. Denno, and the conviction had become final. The *Clifton* panel was in disagreement, however, as to whether, in a case involving a conviction not yet final, a confession could be held admissible when at a hearing held subsequent to Jackson v. Denno it was not established by the prosecution to be voluntary beyond a reasonable doubt. A majority of the active judges of the court have decided to consider the issue and the court has entered an order calling for a hearing on this issue en banc. Counsel are requested to address themselves to that issue and to the relief sought in the light of their contentions taken in conjunction with this opinion.

The cause is continued for a hearing en banc on the issue specified.

So ordered.

## On Rehearing En Banc

Before BAZELON, Chief Judge, and DANAHER, BURGER, WRIGHT, Mc-GOWAN, TAMM, LEVENTHAL and ROBINSON, Circuit Judges, sitting en banc.

LEVENTHAL, Circuit Judge:

On December 20, 1967, a division of this court found error in the District Court's determination (made at 1966 Jackson v. Denno [1] hearing held pursuant to the Supreme Court's mandate),[2] that appellant's confession was voluntary. The division went on to rule that "it cannot fairly be found beyond a reasonable doubt that the confession was voluntary * * * [and] if that is the appropriate standard * * * a new trial must be held without introducing the confession in evidence." En banc hearing was ordered by a majority of the active judges on their own motion to decide whether the reasonable doubt standard is the appropriate one.

■ In Clifton v. United States, 125 U.S.App.D.C. 257, 371 F.2d 354 (1966), cert denied, 386 U.S. 995, 87 S.Ct. 1312, 18 L.Ed.2d 341 (1967), the court rejected the contention that in order to be admissible in evidence a confession must be found by the trial judge to be voluntary beyond a reasonable doubt. We overrule that pronouncement and, in the exercise of our supervisory power over the administration of federal criminal justice in the District of Columbia,[3] adopt the rule that a judicial determination that a confession is admissible cannot be made unless the judge is satisfied beyond a reasonable doubt that the confession was voluntary.[4]

■ The reasons which support our adoption of this rule have been set forth

---

1. 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964),

2. 378 U.S. 571, 84 S.Ct. 1 (1964).

3. Cf. McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943); Fisher v. United States, 328 U.S. 463, 66 S.Ct. 1318, 90 L.Ed. 1382, 166 A.L.R. 1176 (1946); Tate v. United States, 123 U.S.App.D.C. 261, 359 F.2d 245 (1966).

4. Whether this standard is also a constitutional requirement is now and may remain an academic question. Even a petition under 28 U.S.C. § 2255 could raise the question only by making a claim that prior to today's decision the judge admitted a confession in evidence notwithstanding his reasonable doubt of voluntariness. There may not be any such cases. Any such § 2255 petition would be referred to the trial judge who admitted the confession in evidence (unless deceased or unavailable) and he would be in a position to clarify the matter.

elsewhere,[5] and it is unnecessary to dwell upon them. Normally, we recognize, courts are chary of imposing upon trial judges the burden of applying quantitative standards in determining whether proffered evidence is admissible. But there are some places in the law of evidence, outside the domain of confessions, where it has been thought appropriate that a trial judge should follow such an approach.[6] Trial judges have certainly been required by a number of courts to determine voluntariness of a confession beyond a reasonable doubt [7] as a necessary aspect of determining admissibility in evidence. We concur in that rule as a sound implementation of the public interest in preventing involuntary confessions from playing any part in a jury's determination of guilt.[8]

Appellant's case is here on direct appeal. The judgment is reversed and remanded with the instruction that appellant's confession not be admitted in a new trial.

So ordered.

BURGER, Circuit Judge, with whom DANAHER, and TAMM, Circuit Judges join, dissenting:

I dissent for the reason stated in my opinion in Clifton v. United States, 125 U.S.App.D.C. 257, 371 F.2d 354 (1966), cert. denied, 386 U.S. 995, 87 S.Ct. 1312, 18 L.Ed.2d 341 (1967), which, notwithstanding Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), the majority now overrules with respect to the standard of proof governing the trial judge's preliminary determi-

---

5. *See* Clifton v. United States, 125 U.S. App.D.C. 257, 263, 371 F.2d 354, 360 (1966), cert. denied, 386 U.S. 995, 87 S.Ct. 1312, 18 L.Ed.2d 341 (1967) (concurring opinion); United States v. Inman, 352 F.2d 954 (4th Cir. 1965); State v. Yough, 49 N.J. 587, 231 A.2d 598 (1967). The concurring *Clifton* opinion was also based, in the alternative, on constitutional grounds, and so perhaps was *Inman*, but it is not necessary to resolve the constitutional question in this case. *See* note 4 *supra*.

6. *E. g.*, Newton v. Richmond, 198 Va. 869, 96 S.E.2d 775 (1957) (blood test evidence in drunk driving prosecution); Hardeman v. State, 216 Miss. 115, 61 So.2d 797, 802 (1953) (dying declaration); Tucker v. State, Nev., 412 P.2d 970 (1966) (evidence of prior crime); *see generally* State v. Yough, *supra* note 5 and materials cited therein.

7. Mullins v. United States, 382 F.2d 258 (4th Cir. 1967), reaffirming United States v. Inman, 352 F.2d 954 (4th Cir. 1965); Fernandez v. Beto, 3 Cr.L.Rep. 2005 (U.S.Dist.Ct., N.D.Tex. March 6, 1968); State v. Ragsdale, 249 La. 420, 187 So.2d 427 (1966), cert. denied, 385 U.S. 1029, 87 S.Ct. 758, 17 L.Ed.2d 676 (1967); State v. Keiser, 274 Minn. 265, 143 N.W.2d 75 (1966); Lee v. State, 236 Miss. 716, 112 So.2d 254 (1959); State v. Longmore, 178 Neb. 509, 134 N.W.2d 66 (1965); State v. Yough, 49 N.J. 587, 231 A.2d 598 (1967); People v. Huntley, 15 N.Y.2d 72, 255

N.Y.S.2d 838, 204 N.E.2d 179 (1965); State ex rel. Goodchild v. Burke, 27 Wis. 2d 244, 133 N.W.2d 753 (1965), cert. denied, 384 U.S. 1017, 86 S.Ct. 1941, 16 L.Ed.2d 1039 (1966). See also United States v. Feinberg, 383 F.2d 60 (2d Cir. 1967), cert. denied, 389 U.S. 1044, 88 S.Ct. 788, 19 L.Ed.2d 836 (1968); Williams v. Beto, 386 F.2d 16 (5th Cir. 1967). In *Feinberg*, the court upheld a finding of voluntariness when there was no "credible possibility that his written statement * * * had been unconstitutionally coerced," language denoting compliance with a reasonable doubt standard. 383 F.2d at 70. The court took occasion to detail the procedure prescribed by *Inman*, including the reasonable doubt standard, and to note that this was essentially the same as the New York procedure, without even hinting that it found the reasonable doubt standard questionable. 383 F.2d at 70 n. 10. In *Williams*, the court also referred with favor to the New York procedure including the requirement that the confession must be found voluntary by the court beyond a reasonable doubt. 386 F.2d at 18 n. 2.

8. Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (U.S. May 20, 1968); Pinto v. Pierce, 389 U.S. 31, 88 S.Ct. 192, 19 L.Ed.2d 31 (1967) (per curiam); Sims v. State of Georgia, 385 U.S. 538, 87 S.Ct. 639, 17 L.Ed.2d 593 (1967); Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

nation of voluntariness of a confession. There is no need to go beyond anything that was said in *Clifton* except to offer some general observations.

First, *Jackson* does no more than call for a procedure that will insure a *"reliable* determination on the voluntariness issue * * *." *Id.* 378 U.S. at 387, 84 S.Ct. at 1786 (emphasis added). The Court stopped there in the face of Mr. Justice Black's astringent dissent to the effect that the court failed to define the burden of proof by which the trial judge must initially determine voluntariness out of the jury's presence. *Id.* at 404–405, 84 S.Ct. 1774. Thus neither in *Jackson* nor in more recent confession cases has the Supreme Court made any effort to spell out a standard as absolute as the one now adopted. One might well consider that the Supreme Court *sub silentio* decided *against* adopting the reasonable doubt standard by its own refusal to come to grips with the problem. Yet this court now—without waiting for a body of experience to develop under *Jackson*—elects to rush into an area the Supreme Court only four years ago deliberately avoided. It could have done this only because it was not prepared to prescribe a standard for admissibility of evidence which is barren of support in either logic or experience and

for which there is not even a hint of demonstrated need.

It is indeed a remarkable anomaly in the law that a trial judge, in passing on the *admissibility* of a piece of evidence, do so by any particular quantitative standard. Why is it not sufficient that the trial judge be convinced that jurors could reasonably conclude the confession voluntary beyond a reasonable doubt? The jurors, not the judge, are the ultimate triers under our system. This is an elementary rule on the admissibility of an infinite variety of evidence and has been so for centuries.[1]

No other federal appellate court, with the single exception of one,[2] has imposed the reasonable doubt standard in this context. All others have either avoided the problem entirely,[3] or established some qualitative standard consistent with sound judicial experience and far less stringent than what we now adopt.[4]

The use of our supervisory powers to impose this unique and unwarranted burden of proof is a misconception of the purposes of our supervisory powers. As we noted in *Clifton*

> [i]n the future trial judges will be evaluating only those utterances of an accused which have already passed through the whole gamut of screening

1. It is true, as the majority points out in note 6, that there are some rare instances where a quantitative standard has been imposed in passing on admissibility, such as dying declarations, but I suggest these cases do not reflect a majority rule, as was pointed out in State v. Yough, 49 N. J. 587, 231 A.2d 598 (1967). Moreover, I suggest that the majority say just how many "dying declarations" cases this court has had in the last one hundred years. To rely on that gossamer strand to support a rule of law is a confession of the utter bankruptcy of the concept the majority now adopts.

2. Mullins v. United States, 382 F.2d 258 (4th Cir. 1967); United States v. Inman, 352 F.2d 954 (4th Cir. 1965).

3. Kristiansand v. United States, 384 F.2d 301 (5th Cir. 1967); United States v. Taylor, 374 F.2d 753 (7th Cir. 1967) (citing *Inman*, however); Wakaksan v. United States, 367 F.2d 639 (8th Cir.

1966), cert. denied, 386 U.S. 994, 87 S.Ct. 1312, 18 L.Ed.2d 341 (1967). The opinions in these cases, however, do not suggest whether the issue was raised or briefed.

4. United States v. Feinberg, 383 F.2d 60,. 70 (2d Cir. 1967), cert. denied, 389 U.S. 1044, 88 S.Ct. 788, 19 L.Ed.2d 836 (1968) (independent judicial determination); Fisher v. United States, 382 F.2d 31, 34 (5th Cir. 1967) ("clear cut determination" on the record); Moser v. United States, 381 F.2d 363 (9th Cir. 1967), cert. denied, 389 U.S. 1054, 88 S.Ct. 802, 19 L.Ed.2d 850 (1968); Evans v. United States, 375 F.2d 355, 360 (8th Cir. 1967) ("unmistakable clarity"). In *Feinberg* and Williams v. Beto, 386 F.2d 16, 18 n. 2 (5th Cir. 1967), the court did refer to the New York procedure in which the trial judge makes a preliminary determination of voluntariness using the reasonable doubt standard.

processes outlined in *McNabb*, *Mallory*, *Escobedo*, *Massiah*, and *Miranda*. The prospects now are that trial judges, otherwise much overburdened, will not be overworked in passing on the voluntariness of the few confessions which will survive the application of these cases.

125 U.S.App.D.C. at 263, 371 F.2d at 360. Our extraordinary supervisory powers should be exercised only for overriding need, and in such cases we should not be concerned too much if we find we must break with tradition. But here, with the number of usable confessions dwindling to the vanishing point, the need is not present, let alone overriding. But in those few remaining cases to which it will apply, the consequences will be to make convictions of the obviously guilty yet more difficult to secure even when the accused has fully described the details of his criminal act in a confession which is capable of satisfying twelve jurors, beyond reasonable doubt, as to voluntariness. We now hold that one judge must usurp the historic role of the twelve jurors.

This case is but another manifestation in this court of a tendency—happily not widespread in appellate courts—to follow the Jerome Frank syndrome—a school of thought which profoundly mistrusts juries,[5] and prefers fact finding by one judge whose conclusions can more readily be upset by appellate judges.

Since the Constitutional mandate for twelve jurors is explicit and cannot be directly evaded, this mistrust manifests itself in gradually chipping away at the jury function, requiring constantly increasing arrays of special instructions to fence in their discretion and multiple

pretrial processes to restrict what jurors can safely be allowed to see and hear.

I think it is fair to say, again, that this is probably in part, at least, what Mr. Justice Black must have had in mind when in *Jackson* he pointedly said:

> Finally, and even more important, the Court's new constitutional doctrine [Jackson v. Denno] is, it seems to me, a strange one when we consider that both the United States Constitution and the New York Constitution (Art. 1, § 2) establish trial by jury of criminal charges as a bedrock safeguard of the people's liberties. The reasons given by the Court for this downgrading of trial by jury appear to me to challenge the soundness of the Founders' great faith in jury trials. Implicit in these constitutional requirements of jury trial is a belief that juries can be trusted to decide factual issues. Stating the obvious fact that "it is only a *reliable* determination on the voluntariness issue which satisfies the constitutional rights of the defendant * * *," *ante*, p. 1786 (emphasis supplied), the Court concludes, however, that a jury's finding on this question is tainted by inherent unreliability. In making this judgment about the unreliability of juries, the Court, I believe, overlooks the fact that the Constitution itself long ago made the decision that juries *are* to be trusted.

378 U.S. at 405, 84 S.Ct. at 1796 (Black, J., dissenting).

I consider that juries are to be trusted as much when they return verdicts of guilty as when they set an accused free. Jurors do not need judges to act *in loco parentis*.

5. J. Frank, Courts on Trial 108–145 (1949).