COMMONWEALTH vs. JOSEPH LEE ALLEN.

Worcester. January 7, 1985. — July 23, 1985.

Present: HENNESSEY, C.J., WILKINS, LIACOS, NOLAN, & O'CONNOR, JJ.

*Constitutional Law*, Admissions and confessions. *Evidence*, Admissions
and confessions, Expert opinion, Redirect examination, Judicial discre-
tion, Photograph. *Homicide*.

At the hearing of a motion to suppress statements made by the defendant
to a nurse in a hospital room and overheard by a police officer who was
guarding the defendant, evidence warranted the judge's conclusion that
the nurse was not acting on behalf of the police and that, consequently,
the statements were admissible even though they were made without
prior Miranda warnings and without the presence of counsel. [452-456]
It was held that, when the voluntariness of a defendant's incriminating
statements to a private citizen is an issue in a criminal case, the judge
should conduct a voir dire to determine the voluntariness of the statements
and that, if the judge determines that the statements are voluntary, he
should submit the issue of voluntariness to the jury for consideration.
[456-457]
There was no error in a judge's denial of a criminal defendant's motion
to suppress statements made by him to a nurse in a hospital room where
he was recovering from a self-inflicted gunshot wound to the head,
where evidence warranted the judge's conclusion that the statements
were the product of a rational intellect and, therefore, voluntarily made.
[457-458]
At the trial of a murder case the judge did not abuse his discretion in
permitting the defendant's physician to testify that a gunshot wound to
the head had caused the black eyes which the defendant had when he
was arrested and which he claimed to have received in a fight. [458-459]
At the trial of a murder case in which questions by defense counsel, on
cross-examination of the defendant's physician, suggested that the defendant
was suffering from amnesia when he made certain statements, the judge
did not abuse his discretion in permitting the physician, on redirect exam-
ination, to define amnesia and to give his opinion as to whether the defendant
was suffering from amnesia at the time in question. [459]
The judge at the trial of a murder case did not abuse his discretion in admitting
in evidence six photographs depicting the wounds of the two victims.
[459]

Evidence at the trial of a defendant charged with the murder of
his estranged wife and a former neighbor would have warranted the jury
in finding that when the defendant drove to his wife's home on the day of
the killings he brought with him a rifle and ammunition, that the first shots
were fired from outside the neighbor's house while the victims were sitting
in the living room, and that the defendant then entered the house and again
shot the victims, and, thus, the evidence warranted the jury's verdicts of
murder in the first degree based on deliberate premeditation. [460]

INDICTMENTS found and returned in the Superior Court De-
partment on October 13, 1982.

The cases were tried before *John F. Moriarty,* J.

*Robert B. Shumway* (*John G. Bagley* with him) for the
defendant.

*Lynn Morrill Turcotte,* Assistant District Attorney, for the
Commonwealth.

O'CONNOR, J. After a jury trial, the defendant was convicted
of murder in the first degree of his estranged wife, Nancy J.
Allen, and his former neighbor, John W. Vega.[1] He appeals
his convictions directly to this court pursuant to G. L. c. 278,
§ 33E (1984 ed.). The defendant claims error in (1) the denial
of his motion to suppress; (2) the admission of expert testimony
as to the cause of the defendant's black eyes; (3) the admission
of expert testimony as to whether the defendant was amnesic;
(4) the admission of photographs depicting the victims'
wounds; and (5) the denial of his motion for a required finding
of not guilty and of his renewed motion for a required finding
of not guilty or a new trial. He also urges us to exercise our
power under G. L. c. 278, § 33E, to grant him a new trial or
to reduce the degree of guilt. The trial judge's rulings were
not erroneous, and we do not find any reason to exercise our
power under G. L. c. 278, § 33E. We affirm the convictions.

We summarize the evidence presented at trial. The defendant
and Nancy Allen had been married for fifteen years prior to
their separation in 1982. After the separation, it became
commonly known in the neighborhood where the Allens
lived that Nancy Allen was dating John Vega, who lived

---

[1] In response to special questions, the jury found the defendant guilty of
murdering Nancy Allen with deliberate premeditation and extreme atrocity
and cruelty, and they found the defendant guilty of murdering John Vega
with deliberate premeditation.

across the street. The defendant was depressed and upset by the separation. He did not like Vega and did not like his wife's relationship with Vega. On several occasions, he told friends and coworkers that he wanted to shoot Vega, his wife, and himself although the threats were not taken seriously.

On September 10, 1982, a neighbor saw the defendant's car pull into the driveway of the Allen home. At around 9 P.M., other neighbors heard shouting coming from the Vega house, followed by noises that sounded like firecrackers. The following day, the Allens's fifteen year old son returned home after spending the night at a friend's house. There was no one there. Both his father's and mother's cars were in the driveway. He decided to go to Vega's house. He discovered the bodies of his mother and John Vega in the living room of the Vega house. He also found his father lying on a bed in one of the bedrooms. After dismantling his father's rifle, which he had found on the living room floor, he summoned the police. When the police arrived, they found the body of John Vega slumped over in a chair in the living room. He had been shot four times in the head or the neck. Nancy Allen's body lay on the floor near the chair. She had been shot eight times in the head, back, or hand. There were four bullet holes in the front screen door of the Vega house. There was evidence that bullets had been fired through the screen from outside the house.

The police found the defendant on a bed in a first floor bedroom. He had two black eyes and a small cut on his head. The officers testified that the defendant looked as though he had been in a fight, but that otherwise he appeared normal. The police brought the defendant into the kitchen, where they advised him of his Miranda rights. An officer then asked the defendant what had happened to him, and he responded that he had been in a fight. The officer asked the defendant whether he had shot the people in the other room, and he stated that he had. The defendant's responses to further questions seemed disjointed and confused, however, so the police stopped questioning him and brought him to a hospital.

At the hospital another officer again read the defendant his Miranda rights. He asked the defendant whether he had shot

the people that were in the house. The defendant responded that he had. He said that he shot them in the head first, then the back. He also said that he fired through the screen door when he saw them and then went inside and "really opened up." The officer asked the defendant why he had done it, and he replied that he had never liked Vega and that Vega had taken his wife away from him and abused her.

The defendant was eventually examined by doctors who discovered that he was suffering from an apparently self-inflicted gunshot wound to the brain. The bullet had entered his mouth, traversed the eye cavity, severing the right optic nerve, traversed his brain, and exited at the right front of his skull. He underwent an emergency craniotomy during which the wound was cleaned and bone and bullet fragments were removed. He spent several days in the surgical intensive care unit of the hospital. Some time prior to September 17, he was transferred to the neurosurgical-neurology ward.

While the defendant was a patient at the hospital he was kept under twenty-four hour police guard. On September 17, 1982, shortly after 1 A.M., a nurse entered the defendant's room in order to check his vital signs. In addition to checking the defendant's blood pressure, temperature, and pulse, the nurse asked the defendant several questions in order to assess whether he was well oriented. She asked him his name and whether he knew where he was, and he responded correctly. He also knew what day it was. The nurse then asked him if he knew why he was there. He answered that he had shot his neighbor and then himself. The nurse asked him where his wife was. He said she was at home. She asked him whether he had any children, and he responded that he had a fifteen year old son. The nurse then asked the defendant why he had shot the man. The defendant responded, "he was always right and I was the bastard." He went on to say that his wife had sent their son to work on a farm during the summer so she could spend the summer with her boyfriend riding his motorcycle and smoking. The nurse then said to the defendant, "This kind of puts you in a jam," to which the defendant replied, "I know, but if I had to do it again I would use a [.44] Magnum,

not a [.22]. I read a story about a young boy who smashed his father's car and then when he told his father, the father got very mad and the boy went upstairs and shot himself in the mouth with a [.22] and messed up his brain. That is why I would use a [.44] Magnum next time." Sergeant Earl Wagner, the police officer who was guarding the defendant at the time, overheard this conversation and wrote down what was said.

At trial, defense counsel admitted that the defendant had committed the killings, but contested the degree of guilt, arguing that the case was one of manslaughter, not murder. Counsel argued that there was evidence to suggest that the defendant had been in a fight with Vega and had shot the victims in the heat of passion or in self-defense.

1. Prior to trial, the defendant filed a motion to suppress the statements he had made to the nurse on September 17, 1982.[2] The trial judge conducted an evidentiary hearing on the motion at which several witnesses testified. He made extensive findings of fact, including the following: "I am satisfied beyond any reasonable doubt that the defendant did in fact make the statements to Nurse Gancarz that are attributed to him by her and by Sgt. Wagner; that Nurse Gancarz's questions and the defendant's answers were in no way prompted or suggested by the police or other governmental authority; and that in asking the questions the nurse was acting solely in pursuance of her professional responsibilities and not as a proxy or agent of the police. . . .

"I am further satisfied beyond any reasonable doubt that the statements were completely voluntary on the defendant's part. There were no threats and there were no promises. The answers were given by him in willing response to the nurse's questions. No trickery was involved.

"Furthermore, the defendant's answers were the product of a rational intellect at the time when they were given. Despite his recent brain surgery, his answers were completely appropriate for the questions asked and he was well oriented at the time of the interview. I am satisfied, beyond reasonable doubt, that he

---

[2]The defendant did not move to suppress the statements he had made to the police on September 11, and he makes no argument on appeal with respect to those statements.

was fully aware of what he was saying and of the meaning of his statements. . . .

"I recognize the fact that the defendant told the nurse that his wife was 'at home,' even though she was the second victim of the double homicide. The fact that that statement was false, however, does not make it involuntary. I believe the defendant was simply not prepared to admit that he had shot his wife even though he did admit to shooting Vega." The judge denied the motion and the statements were introduced at trial over the defendant's objection.

The defendant argues that the trial judge erred in denying his motion to suppress for three reasons. He argues that the statements were obtained in violation of his Fifth Amendment right against self-incrimination; that the statements were obtained in violation of his Sixth Amendment right to counsel; and that the statements were not voluntary as a matter of law. We address each of these contentions.

The defendant argues that his statements were obtained in violation of his Fifth Amendment privilege against self-incrimination because he was not informed of his rights prior to questioning as required by *Miranda* v. *Arizona*, 384 U.S. 436, 444, 461 (1966). In *Miranda, supra*, "the Supreme Court formulated a series of prophylactic rules (see *Michigan* v. *Tucker*, 417 U.S. 433, 443 [1974]), designed 'to secure the privilege against self-incrimination' from overreaching and coercion during custodial interrogation. Custodial interrogation was defined as 'questioning initiated by *law enforcement officers* after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way' (emphasis supplied). *Miranda* v. *Arizona, supra* at 444." *Commonwealth* v. *Mahnke*, 368 Mass. 662, 676 (1975), cert. denied, 425 U.S. 959 (1976). The Miranda rules do not apply to the activities of a private citizen who is not " 'functioning as an instrument of the police' (*United States* v. *Brown*, 466 F.2d 493, 495 [10th Cir. 1972]; cf. *Coolidge* v. *New Hampshire*, 403 U.S. 443, 487 [1971]), or acting as an agent of the police pursuant to a scheme to elicit statements from the defendant by coercion or guile (cf., e.g., *Commonwealth* v. *White*, [353

Mass. 409], 416 [(1967), cert. denied, 391 U.S. 968 (1968)]; *Commonwealth* v. *Martin*, 357 Mass. 190, 193 [1970])." *Commonwealth* v. *Mahnke, supra* at 677. See *Commonwealth* v. *Roberts*, 6 Mass. App. Ct. 891, 891 (1978).

In this case, a nurse, not the police, initiated and conducted the questioning. The judge made findings, supported by the evidence, that neither the nurse's questions nor the defendant's responses were prompted or suggested by law enforcement officials, and that the nurse was not acting as an agent or proxy for the police. The defendant contends that an agency relationship arose when the police officer realized that the defendant's responses were significant to the charges against him yet did nothing to stop the questioning. We disagree. "There was no obligation on the part of the police officer to warn the defendant of his presence or to stop the defendant from speaking." *Commonwealth* v. *Kelly*, 10 Mass. App. Ct. 847, 849 (1980).

The judge's finding that the nurse was not acting on behalf of the police also disposes of the defendant's claim that his statements were admitted in violation of the Sixth Amendment because they were made without counsel present. The defendant relies on *Massiah* v. *United States*, 377 U.S. 201 (1964), which held that it was a denial of the right to counsel guaranteed by the Sixth Amendment for law enforcement officials to elicit incriminating information deliberately from a defendant in the absence of counsel after adversary proceedings had commenced. See *Commonwealth* v. *Brant*, 380 Mass. 876, 882, cert. denied, 449 U.S. 1004 (1980). The Sixth Amendment is not violated when a private citizen, unconnected with law enforcement authorities, elicits incriminating statements. See *United States* v. *Mitchell*, 417 F.2d 1246, 1249 (7th Cir. 1969).

The defendant argues that his statements to the nurse were not voluntary because they were coerced and because they were attributable to his head injury and thus were not the product of a rational intellect. "It is well established that due process is violated when a conviction is based, in whole or in part, upon an involuntary confession. E.g., *Jackson* v. *Denno*, 378 U.S. 368, 376 (1964)." *Commonwealth* v. *Brady*, 380 Mass. 44, 48 (1980). A judicial determination of voluntariness involves

an assessment of "the totality of relevant circumstances to ensure that the defendant's confession was a free and voluntary act and was not the product of inquisitorial activity which had overborne his will." *Commonwealth* v. *Mahnke, supra* at 680. In addition to such factors as whether there was physical or psychological coercion, see *Commonwealth* v. *Mahnke, supra* at 679-680; *Commonwealth* v. *Harris,* 371 Mass. 462, 469-472 (1976), the judge must consider the defendant's physical and mental condition. Statements that are attributable in large measure to a defendant's debilitated condition, such as insanity, see *Blackburn* v. *Alabama,* 361 U.S. 199, 207 (1960); *Commonwealth* v. *Masskow,* 362 Mass. 662, 667-668 (1972), drug abuse or withdrawal symptoms, see *United States ex rel. Hayward* v. *Johnson,* 508 F.2d 322, 324-328 (3d Cir.), cert. denied, 422 U.S. 1011 (1975), intoxication, see *Commonwealth* v. *Hosey,* 368 Mass. 571, 577-579 (1975), or "the concussion of a bullet shattering in his head," *Pea* v. *United States,* 397 F.2d 627, 634 (D.C. Cir. 1967), are not the product of a rational intellect or free will and are involuntary.

The fact that the defendant's statements were elicited by a nurse rather than by law enforcement officials is not relevant to his claim that his statements should have been suppressed because they were coerced. "[U]nder the law of this Commonwealth, a judge must determine the voluntariness of statements 'extracted by private coercion, unalloyed with any official government involvement' " (footnote omitted). *Commonwealth* v. *Paszko,* 391 Mass. 164, 176-177 (1984), quoting *Commonwealth* v. *Mahnke, supra* at 680. We recognize that "a statement obtained through coercion and introduced at trial is every bit as offensive to civilized standards of adjudication when the coercion flows from private hands as when official depredations elicit a confession. Statements extracted by a howling lynch mob or a lawless private pack of vigilantes from a terrorized, pliable suspect are repugnant to due process mandates of fundamental fairness and protection against compulsory self-incrimination." *Commonwealth* v. *Mahnke, supra* 681.

However, there is no support in the record for the defendant's claim that his statements were coerced. The trial judge found

that the statements were not the result of threats or promises, and that no trickery was involved. The record fully supports those findings; indeed, it is devoid of any evidence to the contrary. Thus, the defendant was not entitled to have the statements suppressed on the ground that they were coerced.

The Commonwealth argues that, absent coercion, a determination of the voluntariness of statements made to private citizens is not a predicate to their admissibility. While we have never squarely decided the issue, our decisions suggest that a judicial determination of voluntariness is necessary whenever questions concerning the voluntariness of a defendant's statements are raised, even when the statements are made to private citizens. See *Commonwealth* v. *Paszko, supra* at 182-183 (the "better practice" is to treat statements to private citizens as if they were statements to the police); *Commonwealth* v. *Vazquez,* 387 Mass. 96, 101 n.9 (1982). See also *Commonwealth* v. *Brady, supra* at 50 n.2. The rationale for excluding statements made to law enforcement officials by someone who "by dint of physical or mental impediments is incapable of withholding the information conveyed, 'can without difficulty be articulated in terms of the unreliability of the [statement], the lack of rational choice of the accused, or simply a strong conviction that our system of law enforcement should not operate so as to take advantage of a person in this fashion.' " *Commonwealth* v. *Paszko, supra* at 177, quoting *Backburn* v. *Alabama,* 361 U.S. 199, 207 (1960). Those concerns are no less valid when the involuntary statement is made to a private citizen rather than a law enforcement official. Therefore, we hold today that the "better practice," to which we referred in *Commonwealth* v. *Paszko, supra* at 182-183, is the law in this Commonwealth. When the voluntariness of a defendant's statements to private citizens is an issue, the judge should conduct a voir dire to determine the voluntariness of the statements. If the judge determines that the statements are voluntary, in accordance with our "humane practice," the issue of voluntariness should be submitted to the jury for consideration. See *Commonwealth* v. *Harris,* 371 Mass. 462, 469-470 (1976). We futher hold that the Commonwealth has the burden of proving to the judge

and the jury the voluntariness of such statements beyond a reasonable doubt. See *Commonwealth* v. *Tavares*, 385 Mass. 140, 152, cert. denied, 457 U.S. 1137 (1982).

In this case, the judge found that the defendant's statements to the nurse were voluntary beyond a reasonable doubt.[3] We consider whether that finding was warranted. Whether the defendant's statements were the product of a rational intellect is a question of fact. "[A]n appellate court cannot disturb the judge's findings of subsidiary facts if they are supported by the evidence. In like manner, this court may not draw inferences contrary to those of the trial judge which were derived from his subsidiary findings *and* from oral testimony" (emphasis in original). *Commonwealth* v. *Mahnke, supra* at 689. On voir dire, the physician who had performed the surgery on the defendant testified that the damage to the defendant's brain was in the area that controls certain arm and face muscles and coordinated eye movements and is also responsible for acquiring and utilizing certain types of social consciousness, such as appropriate public behavior. He further testified that the defendant had a good recovery from his surgery and that he was appropriately oriented as of September 17. The nurse who elicited the statements testified that, based on his responses to her questions, she felt the defendant was oriented. The police officer who overheard the statements testified that, at some time prior to September 17, he had had a casual conversation with the defendant during which the defendant discussed computers with him. During that conversation, the defendant seemed rational and alert; he was able to understand and his answers made sense.

The judge found that the defendant's statements were appropriate to the questions asked, and that he was aware of what he was saying and of the meaning of his statements. On the basis of those findings and the evidence on voir dire, the judge was warranted in concluding that the statements were the product of a rational intellect.

---

[3] The judge properly instructed the jury that they could only consider the defendant's statements if they were satisfied beyond a reasonable doubt that the statements were voluntary.

The defendant argues that the decision in *Pea* v. *United States, supra,* requires the conclusion that his statements were involuntary as a matter of law. We disagree. Although *Pea* also involved statements made by a defendant with a self-inflicted gunshot wound to the head, the evidence relative to the voluntariness of the statements in that case was substantially different from the evidence before the judge here. In *Pea,* the defendant's statements were made shortly after he was injured. There was uncontradicted testimony from the defendant's physician that he was intoxicated when he made the statements, *id.* at 633, and that because of a concussion he was confused and lethargic so that he was "indifferent to protect himself." *Id.* at 634. In this case, the defendant's statements were made almost one week after he was injured, when his recovery had progressed significantly. Both the nurse and his physician testified that they believed him to be well oriented at the time the statements were made.

2. The defendant argues that the judge erred in admitting testimony by the defendant's physician that his black eyes were caused by the gunshot wound because an "expert may not testify as to conclusions which are within the province of the jury," and there was other evidence from which the jury, unaided by expert testimony, could have found that the black eyes were caused by a fight. A trial judge has considerable discretion in admitting expert testimony. "All that is necessary is that the subject matter be one about which special knowledge beyond that possessed by the ordinary juryman will aid the jury in their deliberations, and that a person possessing such knowledge give opinions pertinent to the issues of the case founded upon facts which either are conceded or could warrantably be found upon other evidence." *Commonwealth* v. *Makarewicz,* 333 Mass. 575, 591-592 (1956), quoting *Lovasco* v. *Parkhurst Marine Ry.,* 322 Mass. 64, 67 (1947). The physician clearly possessed knowledge beyond that of an ordinary juror of the effects of a bullet wound to the brain. The fact that the cause of the defendant's black eyes was ultimately a question to be decided by the jury did not render the physician's

testimony inadmissible. See *Coulombe* v. *Horne Coal Co.*, 275 Mass. 226, 229-230 (1931). There was no error.

3. During cross-examination defense counsel asked the physician whether amnesia was a common sequel to severe head injuries such as the defendant's. The physician responded that it was, especially if the injured person lost consciousness. During redirect examination, the physician defined amnesia and gave his opinion as to whether the defendant was suffering from amnesia on September 17, 1982. The defendant argues that this testimony was inadmissible because it was beyond the scope of cross-examination and because it was not a proper subject for expert testimony.

"The purpose of redirect examination is to explain or rebut adverse testimony or inferences developed during cross-examination." *Commonwealth* v. *Hoffer*, 375 Mass. 369, 375 (1978). Defense counsel's questions in cross-examination suggested that the defendant was suffering from amnesia, and the prosecutor was entitled to explore the issue on redirect. In any event, the judge has discretion to allow or to limit redirect examination on matters outside the scope of cross-examination. *Commonwealth* v. *Cadwell*, 374 Mass. 308, 314 (1978). The meaning of the term "amnesia," whether the defendant's injury could cause amnesia, and whether the defendant appeared to be suffering from amnesia are all areas in which the physician, a neurosurgeon, has specialized knowledge. The testimony was properly admitted.

4. The defendant argues that the judge abused his discretion in admitting six photographs depicting the wounds of the victims. The photographs revealed the number, nature, and location of the wounds, information relevant to the Commonwealth's case. The defendant does not suggest that the photographs did not accurately portray the condition of the victims. Whether photographic evidence is "so inflammatory in nature as to outweigh its probative value and preclude its admission is a question to be determined by the trial judge in the exercise of his sound discretion." *Commonwealth* v. *Stirling*, 351 Mass. 68, 72 (1966), quoting *Commonwealth* v. *D'Agostino*, 344 Mass. 276, 279 (1962). There was no error.

5. The defendant appeals from the denial of his motion for required findings of not guilty, made at the close of the Commonwealth's case and renewed after the verdicts were returned. In reviewing the denial of a motion for a required finding, we consider whether the evidence, viewed in a light most favorable to the Commonwealth, is sufficient so that the jury "might properly draw inferences, not too remote in the ordinary course of events, or forbidden by any rule of law, and conclude upon all the established circumstances and warranted inferences that the guilt of the defendant was proved beyond a reasonable doubt." *Commonwealth* v. *Clifford*, 374 Mass. 293, 296 (1978), quoting *Commonwealth* v. *Vellucci*, 284 Mass. 443, 445 (1933). Viewed in this light, the evidence summarized above was sufficient to allow the jury to find the defendant guilty of murder in the first degree. The jury could have found that when the defendant drove to his home on September 10, 1982, he brought with him a rifle and ammunition. They further could have found that the first gunshots were fired from outside the Vega house, while the victims were sitting in the living room, and that the defendant then entered the house and again shot the victims. That evidence warranted the jury's verdicts of murder in the first degree based on deliberate premeditation.

6. We have reviewed the entire record in this case as required by G. L. c. 278, § 33E. We conclude that the jury's verdicts were fully supported by the evidence and the law. The interests of justice do not require either a new trial or the entry of verdicts of a lesser degree of guilt.

*Judgments affirmed.*