IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 74209-4-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| ENCARNACION SALAS IV, | ) | PUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: January 8, 2018 |
| | ) | |

BECKER, J. — The appellant, Encarnacion "EJ" Salas, was charged with first degree murder with a deadly weapon for stabbing his close friend Jesús "Jesse" Lopez in October 2014. Salas testified that he acted in self-defense. A jury convicted Salas of second degree murder. We reverse the conviction, finding prosecutorial misconduct in the use of PowerPoint slides and ineffective assistance of counsel for failure to suppress statements Salas made to medical providers.

FACTS

According to testimony at trial, Salas moved from Texas to Washington in 2013. He was 21 at the time. He shared a Lynnwood apartment with his aunts, Ruby Salas and Cristal Salas. Lopez lived with his mother in the same apartment complex and was Ruby's coworker. Lopez was about 10 years older than Salas. The two developed a friendship. Salas said they regularly visited

each other's apartments to "drink, smoke marijuana, talk, watch TV shows, cartoons."

After a while their relationship became, as Salas described it, "kind of homosexual." Their friends saw them as a couple. Salas testified that "it wasn't a true homosexual relationship. It was more trying to get to that level, to be comfortable, in order to get there." Salas described a time around August 2014 when Lopez made a sexual advance. "I tell him I'm uncomfortable with that, I'm not ready."

On October 24, 2014, around 11:30 p.m., police were dispatched to the Lopez apartment. They found Lopez dead, lying on his back in the kitchen, blood on the walls and floors, and "blood in quite a few places around his body." An officer observed "a very significant injury to the right side of his neck." A forensic pathologist determined that Lopez died from knife injuries. He had 15 total knife wounds. Some were stab wounds, and others were referred to as "incised" wounds. There were significant injuries to his lungs, his liver, and his external jugular vein, all of which the examiner believed sufficient to cause death if not urgently treated.

The trial took place over 10 days in October 2015. The State's theory was that Salas "brutally hacked up" Lopez and he did it "not because he was scared, but because he was conflicted about his sexuality." The defense theory was that Lopez attacked Salas and Salas killed him in self-defense.

Antonia Lopez, the decedent's mother, testified that Salas and Lopez were both drinking that night in the apartment. Antonia came out of her bedroom when

she heard a loud noise. She saw the two of them "struggling" near the door to a balcony. Lopez, who had blood on his arm, was inside the apartment and Salas was outside on the balcony. Antonia believed that Salas was trying to pull Lopez outside onto the balcony.

Antonia said she pulled her son away from Salas and leaned him up against the kitchen counter. Salas ran to the front door. Antonia followed and tried to prevent Salas from leaving, but at that point, Lopez "basically fell and fainted" and said, "'Mom, help me, I'm dying.'" Antonia saw Salas take "something" from his backpack. Salas came back to where Lopez was lying on the kitchen floor, kneeled over him, and did "something on the neck." Antonia could not see if Salas was holding anything, but "he was really mad, just going at it," "Like cutting him." She did not notice whether Lopez had injuries or blood on his face or neck before Salas started "doing something" to his neck. Antonia said she grabbed Salas by his ears "to get him out of there." Salas left the apartment by jumping down from the balcony. Antonia summoned aid, but within minutes, Lopez was dead where he lay on the floor.

Salas testified that he came over to the Lopez apartment that evening with a backpack containing alcohol and a knife. Salas testified that he "always" carried a knife on him and had done so since living in Texas. He said he and Lopez were drinking and playing with his knife, twirling or spinning it. At one point, they went outside on the balcony to smoke marijuana. Salas said Lopez "made a pass" at him by attempting to grab his genital area. Salas started yelling, and Lopez struck him with what Salas soon realized was his knife. Salas

said he pried the knife away from Lopez and Lopez tried to get it back. They ended up back inside the apartment, in a close and "constant" struggle. Salas said that he cut and stabbed Lopez to fend off his attack.

Salas testified that he knocked Lopez to the ground and saw that there was blood coming from his neck. Salas said he knelt down and "applied pressure" to stop the bleeding. He denied making any cutting motion. He remembered Antonia pulling him off, at which point he left the apartment. He spent a night in the woods before returning to his apartment.

The court instructed the jury on first and second degree murder. Over the State's objection that the evidence "clearly rises above manslaughter," the court instructed the jury to consider the lesser included offenses of first and second degree manslaughter if unable to agree on murder. The court also provided a standard self-defense instruction (WPIC 16.02), an instruction defining "great personal injury" (WPIC 2.04.01), an instruction that actual danger is not necessary for a homicide to be justifiable (WPIC 16.07), and an instruction on the meaning of "necessary" force (WPIC 16.05).

The jury returned a verdict finding Salas guilty of second degree murder. Salas had no prior convictions. With an offender score of zero, the standard range for the sentence was 123 to 220 months. With the deadly weapon enhancement, the presumptive sentence range was 147 to 244 months. The court sentenced Salas to 244 months. Salas appeals from the judgment and sentence.

PROSECUTORIAL MISCONDUCT

Salas contends he was denied a fair trial by several instances of prosecutorial misconduct in argument. To prevail, he must show that in the context of the record and all of the circumstances of trial, the prosecutor's conduct was both improper and prejudicial. In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 704, 286 P.3d 673 (2012). Prejudice means a substantial likelihood that the misconduct affected the jury verdict. Glasmann, 175 Wn.2d at 704. A defendant who does not object to the improper conduct at trial must demonstrate on appeal that the error was so flagrant and ill-intentioned that an instruction would not have cured the prejudice. Glasmann, 175 Wn.2d at 704.

1. "Cop-out"

In closing, the prosecutor argued that if there was any issue for the jury to consider, it was premeditation. She explained that she was not going to discuss the manslaughter instructions because the evidence "makes it clear that this is murder, not manslaughter." In rebuttal closing argument, she asserted that convicting Salas of manslaughter "would be a cop-out."

When there is evidence that the homicide was neither premeditated nor intentional and the trial court has properly put the issue of manslaughter before the jury, it is improper to argue that manslaughter is a "'cop-out'" and inapplicable. People v. Howard, 232 Ill. App. 3d 386, 390, 597 N.E.2d 703, 173 Ill. Dec. 729, appeal denied, 146 Ill.2d 639 (1992). Here, the jury could have reasonably concluded that Salas did not kill Lopez intentionally. The two were close friends, and they both were drinking before they began to fight. But Salas

did not object to this remark, and it was not incurably prejudicial. Reversal is not warranted based on this comment alone.

2. Stab wounds

Salas contends the prosecutor misrepresented the testimony about the amount of blood and the number of lethal stab wounds. We disagree. The record reflects that the prosecutor argued reasonable inferences from the forensic evidence. And the trial court twice sustained defense objections.

3. PowerPoint slide show

Salas raises a more serious concern with his challenge to part of the PowerPoint presentation that accompanied the prosecutor's argument.

Closing argument provides an opportunity for counsel to summarize and highlight relevant evidence and argue reasonable inferences from the evidence. Multimedia tools such as PowerPoint presentations offer an effective and engaging method of communicating such information to the jury. State v. Walker, 182 Wn.2d 463, 476-77, 341 P.3d 976, cert. denied, 135 S. Ct. 2844 (2015). But a prosecutor's freedom in using such tools is not without limits. Prosecutors have a "duty to 'subdue courtroom zeal,' not to add to it, in order to ensure the defendant receives a fair trial." Walker, 182 Wn.2d at 477, quoting State v. Thorgerson, 172 Wn.2d 438, 443, 258 P.3d 43 (2011).

The prosecutor began closing argument by summarizing the evidence of intentional murder. Then she moved to the topic of self-defense:

> And Instruction No. 18 says that necessary means no reasonably effective alternative to the use of force appeared to exist. And two, the amount of force used was reasonable to effect the lawful purpose intended.

6

This is the only knife out on the balcony. Now, the defendant has it. The defendant could toss it over the edge, now, it's gone. We know that the defendant can take Jesse. He's a fighter, football player. There's no issue there. Jesse was a bandleader, saxophone player, he liked to exercise, but the defendant can take Jesse. You get rid of the knife, you get rid of the threat of any great bodily injury, any death. But instead, according to him, now, he has the knife. He says, oh, Jesse kept coming at me, so I had to punch and kick and hit him, basically, stab him 15 times.

And Instruction No. 19, acting on appearances. The defendant doesn't even describe the appearance of danger, once he gets the knife back from Jesse. And according to him, that's when all of those injuries happened to Jesse, when he has the knife.

At this point in the argument, the prosecutor began to display a 22-slide PowerPoint presentation. The slide show had not been previously seen by the defendant or the court.

The first slide, shown below, is a photograph of Lopez at an amusement park. He is crouched down, smiling, surrounded by three people dressed in cartoon costumes. A caption above the photograph reads, "Jesse Lopez: 5'5.5", Band leader, saxophone player, customer service representative." Juxtaposed with this photograph is a grim image of Salas's face cropped from his driver's license. It is captioned, "EJ Salas: 5'11", Football player, fighter, outdoorsman":

St. v. Encarnacion Salas IV

EJ Salas: 5'11", Football player, fighter, outdoorsman

Jesse Lopez: 5'5.5", Band leader, saxophone player, customer service representative

7

Repeating the words on the slide, the prosecutor continued:

> (Pause.) So this is what we have. Self-defense claim.
> There's no issue that he killed Jesse, that EJ Salas, 5'11", football
> player, fighter, apparently involved in fight club, outdoorsman. And
> you've got Jesse Lopez, 5'5-1/2', bandleader, saxophone player,
> and a customer-service representative.

The second slide, titled "Relationship," showed photographs of Salas and Lopez together. The prosecutor argued, "They were in a relationship, they were, clearly, a couple. . . . they spent a lot of time together. There's something going on there."

Defense counsel objected to the slide show after seeing the first two slides. In a hearing outside the jury's presence, he objected "to all of these slides, with text, on the screen," citing Glasmann and Walker. He particularly objected to the first slide, calling it equivalent to the slide in Walker that prejudicially juxtaposed images of the defendant and victim. See Walker, 182 Wn.2d at 478.

The prosecutor responded that the slides were not inappropriate under Glasmann and Walker. Unlike in those cases, she said, the information contained in the slide show, "which is not altering the pictures, are facts that were also testified to at trial."

> Both of those exhibits have been admitted at trial. If I held them up
> next to each other, and said what I wanted to say, it was no
> different, although less efficient by far, than already having them set
> up so that we don't have to dig through a bunch of exhibits, and pull
> things out. It's really just to assist in the efficiency of what would
> happen anyway. There's no personal opinion expressed, there was
> no comment on guilt or innocence.
> This case is about a self-defense claim, and certainly, the
> differences in their size, their athletic ability and their background in
> fighting is relevant to that issue. That has all come out at trial.

8

After reviewing the remaining slides, the court overruled the objection and the prosecutor continued. Most of the remaining slides presented photographs of the crime scene and injuries, some captioned with witness testimony. The prosecutor used these slides to illustrate her argument that the physical evidence, corroborated by Antonia's testimony, defeated Salas's claim of self-defense and called for a verdict of intentional murder.

The last slide displayed an uncaptioned photograph of Lopez enjoying a Ferris wheel ride with Cristal. This photograph came into evidence as an exhibit during the testimony of Salas's younger brother, who was asked by the prosecutor to use it to identify Lopez.



The prosecutor did not refer to the last slide in argument. She ended by narrating what Salas did between when he left the Lopez apartment and when he was arrested by the police the next morning in his own apartment.

And when the police come, he runs to his bedroom, hides the knife in the closet, and then says, what, what am I under arrest for? What? What are you doing here? He knows he killed Jesse. He knows why they're there. But he's a tough guy. He's not going to go down on his hands and knees, unless it's on his own terms. He is not afraid of a bunch of cops with guns and tasers. They tase him twice, and he doesn't go down. He's only surrendering on his own terms. But he wants you to believe that he was afraid of him, unarmed, 5'5"Jesse Lopez.

The defense closing argument emphasized the State's burden to disprove self-defense. Counsel argued this burden had not been met and urged the jury not to be swayed by the emotional impact of the slide show:

> What the State wants you to believe -- look at the pictures they just showed you. They want you to be emotional. They're showing you blood, they're showing you Jesus Lopez with a bunch of Smurf characters. . . .
>
> The last picture, they left it up there for at least a minute. It's Jesus with Cristal Salas, who also came and testified. Well, he looks like a nice guy. I think that was, essentially, what you're supposed to take from that. . . .
>
> . . . .
>
> . . . They have to disprove self-defense. . . . So the question is can they show, based on the actual testimony, not on maybes, not on pictures of him with Smurfs with the aunt, not on emotion, can they actually prove to you that he was not justified in doing this.

Salas contends the trial court erred by overruling his objection to the PowerPoint display. He objects in particular to the first slide.

During closing argument in Glasmann, the prosecutor displayed a PowerPoint presentation of more than 50 slides. In some, the word "GUILTY" in red letters was superimposed over a booking photograph of Glassman in which he was unkempt and bloody. Glasmann, 175 Wn.2d at 701-02. The prosecutor in Walker made a similarly sensational presentation. More than 100 of the 150 slides were headed with the words "'DEFENDANT WALKER GUILTY OF PREMEDITATED MURDER.'" Walker, 182 Wn.2d at 468. Following Glasmann and Walker, this court has reversed a number of convictions involving similar PowerPoint presentations by prosecutors, including in State v. Hecht, 179 Wn. App. 497, 319 P.3d 836 (2014), and State v. Fedoruk, 184 Wn. App. 866, 339 P.3d 233 (2014), as well as in unpublished opinions.

The prosecutor in the present case did not make the mistake of superimposing the word "guilty" over a photograph of the defendant or modifying exhibits with superimposed text. The State defends the slides on the basis that the photographs had all been admitted as exhibits and the captions contained information elicited from the witnesses.

But under Walker and Glasmann, the potential prejudice of a slide presentation does not arise solely from the alteration of exhibits. The broader proposition is that slide shows may not be used to inflame passion and prejudice. In Walker, the slide show "appealed to passion and prejudice by juxtaposing photographs of the victim with photographs of Walker and his family, some altered with the addition of inflammatory captions and superimposed text." Walker, 182 Wn.2d at 468.

The first slide in the present case, though more subdued, has the same flaw. The photograph of Lopez conveys that he was happy, fun-loving, and even childlike. He appears small as he poses with a group of cartoon characters. The photograph of Salas, on the other hand, shows only the unappealing image of his face. It is similar to the booking photo in Walker, found problematic when shown alongside a smiling picture of the victim. Walker, 182 Wn.2d at 474.

It was not improper for the prosecutor to remind the jury that Salas was taller than Lopez. Relative size, strength, and age of the individuals involved is relevant in a self-defense case. See State v. Painter, 27 Wn. App. 708, 713, 620 P.2d 1001 (1980), review denied, 95 Wn.2d 1008 (1981). But if the purpose of the slide was to compare them in size, the photographs are not helpful. The

photograph of Salas shows only his head. And the caption does not mention the fact that the two men were roughly equivalent in weight.

The captions reinforce the visual contrast. They evoke high school stereotypes. Lopez was a musician, whereas Salas played football and was once in a fight club. Which type of person was more likely to initiate a fight? Salas was an outdoorsman, while Lopez was a customer service representative. Which type of person was more likely to use a knife?

A rule of thumb for using PowerPoint is "If you can't say it, don't display it." Kyle C. Reeves, PowerPoint in Court: The Devil's Own Device, or A Potent Prosecution Tool?, 48-DEC PROSECUTOR 26, 33 (2014). PowerPoint slides should not be used to communicate to the jury a covert message that would be improper if spoken aloud. The juxtaposition of images and captions in the first slide communicates what the prosecutor could not, and did not, argue aloud: Salas was by nature an aggressive and intimidating person, and therefore had no reason to fear Lopez, who by nature was childlike and submissive. The prosecutor in effect used the slide to prove the character of the two men "in order to show action in conformity therewith," improper under ER 404(b). See State v. Everybodytalksabout, 145 Wn.2d 456, 468, 39 P.3d 294 (2002).

Salas also objects to the last slide, an uncaptioned photograph of Lopez on a Ferris wheel resting his head on Cristal's shoulder. By itself, this slide was not improper. "In-life" photographs are generally admissible despite their potential for inflaming the jury. State v. Rice, 110 Wn.2d 577, 600, 757 P.2d 889 (1988), cert. denied, 491 U.S. 910 (1989). The problem with the last slide is that

it completes and reinforces the message the first slide was intended to convey: Jesse Lopez was a sweet, deferential person, and it would have been out of character for him to attack Salas with a knife.

We conclude that the prosecutor committed misconduct by using the first and last slides.

Prosecutorial misconduct requires reversal only if the defendant demonstrates prejudice. Glasmann, 175 Wn.2d at 704. The inquiry is not whether there was sufficient evidence to convict. Rather, the question is whether the prosecutor's comments deliberately appealed to the jury's passion and prejudice and encouraged the jury to base the verdict on the improper argument rather than on properly admitted evidence. Glasmann, 175 Wn.2d at 711.

Visual arguments "'manipulate audiences by harnessing rapid unconscious or emotional reasoning processes and by exploiting the fact that we do not generally question the rapid conclusions we reach based on visually presented information.'" Glasmann, 175 Wn.2d at 708, quoting Lucille A. Jewel, Through a Glass Darkly: Using Brain and Visual Rhetoric to Gain a Professional Perspective on Visual Advocacy, 19 S. CAL. INTERDISC. L.J. 237, 289 (2010). People tend to believe what they see and will not "'step back and critically examine the conclusions they reach, unless they are explicitly motivated to do so.'" Glasmann, 175 Wn.2d at 709, quoting Jewel, at 293. "'Thus, the alacrity by which we process and make decisions based on visual information conflicts with a bedrock principle of our legal system—that reasoned deliberation is necessary for a fair justice system.'" Glasmann, 175 Wn.2d at 709, quoting Jewel, at 293.

The risk of swaying a jury through use of prejudicial imagery is perhaps highest during closing argument, when jurors may be particularly aware of, and susceptible to, the arguments presented. Glasmann, 175 Wn.2d at 707-08.

The first slide and the last slide that reinforced it were among the jurors' final impressions of the case. The first slide in particular was designed to override the evidence that Salas killed Lopez either recklessly or out of a reasonable fear for his own safety. It made the visual point that Salas was dangerous, while Lopez was meek.

PowerPoint slides can be improper and prejudicial even if they do not number in the hundreds and do not shout "GUILTY GUILTY GUILTY!" in red letters. We conclude there was a substantial likelihood that the visual presentation prejudiced Salas's right to a trial in which his claim of self-defense and the alternative of manslaughter could be fairly considered. He is entitled to a new trial.

## STATEMENTS TO MEDICAL PERSONNEL

Salas is entitled to a new trial for an additional reason. Due to ineffective assistance of counsel, the jury was allowed to hear an officer's testimony that Salas "chuckled" when he admitted killing Lopez during his examination at the hospital.

Officers arrested Salas in his apartment the day after the killing. When advised of his Miranda[1] rights, Salas requested an attorney. It was determined

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

that he first needed treatment for a gash on his arm. A police officer took Salas to the hospital and told the staff they were there for a medical clearance so that Salas could be booked into jail. The officer handcuffed Salas's hand to a bed in the examination room. He remained in the room while the nurse and doctor tended to Salas.

Salas moved to suppress the officer's testimony about what Salas said during this examination, on the ground that the doctor and nurse were state agents and the examination amounted to custodial interrogation. The trial court denied the motion. At trial, the officer testified that the nurse asked Salas how his arm was wounded. Salas answered, "I don't know, on barbed wire or a tree." The doctor asked Salas if he had been assaulted. The officer testified that in response, Salas "chuckled and he said—he said, no, I killed somebody." Salas did not object.

Because Salas had invoked his right to counsel, he should not have been subjected to interrogation by state agents while he was at the hospital. Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981). In his opening brief on appeal, Salas argues that his statements to the hospital personnel were obtained in violation of Miranda because the doctor and nurse were state agents. This claim presents an issue of law which we review de novo. State v. Daniels, 160 Wn.2d 256, 261, 156 P.3d 905 (2007). The test is objective—what a reasonable person in the defendant's position would have believed. State v. Heritage, 152 Wn.2d 210, 217, 95 P.3d 345 (2004).

15

The record does not demonstrate that the doctor and nurse were state agents. The hospital was private. There was no indication that the nurse or doctor were connected to the state or were authorized to exercise the state's authority over Salas. There is no evidence that the officer who was standing by directed or otherwise influenced the nurse or doctor in their verbal interaction with Salas. The only purpose of the questions they asked Salas was to facilitate treatment of his injury.

Cases from other jurisdictions hold that when medical professionals question a suspect "solely for the purpose of providing treatment," Miranda protections do not apply. U.S. v. Borchardt, 809 F.2d 1115, 1118 (5th Cir. 1987), citing Commonwealth v. Allen, 395 Mass. 448, 480 N.E.2d 630 (1985); State v. Jones, 386 So. 2d 1363, 1366 (La. 1980); State v. Hall, 183 Mont. 511, 600 P.2d 1180, 1182 (1979); People v. Hagen, 269 Cal. App. 2d 175, 74 Cal. Rptr. 675 (1969). The mere presence of a police officer during a medical examination does not compel a different result. See, e.g., Allen, 395 Mass. at 454.

We conclude the doctor and nurse did not act as state agents. There was no Miranda violation. The trial court did not err in denying the motion to suppress on the grounds argued below and in Salas's opening brief on appeal.

In a supplemental brief, Salas contends that admission of his statements to the doctor and nurse violated his statutory right to patient confidentiality. Salas did not raise this issue in his motion to suppress. He argues that trial counsel's failure to argue for suppression based on patient confidentiality amounts to ineffective assistance. A claim of ineffective assistance of counsel is an issue of

16

constitutional magnitude that may be considered for the first time on appeal. State v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177 (2009).

A party claiming ineffective assistance must show that counsel's performance was deficient and prejudicial. State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Performance is deficient when it falls below an objective standard of reasonableness based on all of the circumstances. McFarland, 127 Wn.2d at 334. The defendant must show there was no legitimate strategic or tactical reason for counsel's actions. McFarland, 127 Wn.2d at 335.

The physician-patient privilege protects statements made by a patient in the course of treatment. RCW 5.60.040(4). "Actual treatment is not necessary; the only requirement for the relationship to arise by implication is that the patient believe the examination is being made for the purpose of treatment." State v. Gibson, 3 Wn. App. 596, 598, 476 P.2d 727 (1970), review denied, 78 Wn.2d 996 (1971). This may be inferred from the circumstances without formal proof. Gibson, 3 Wn. App. at 598.

The general rule is that the presence of a third party vitiates the privilege. Gibson, 3 Wn. App. at 598. There is an exception to the general rule if the third party is present as a "'needed and customary participant'" in the treatment consultation. Gibson, 3 Wn. App. at 599, quoting C. McCormick, LAW OF EVIDENCE § 104 (1954). In other words, "physician" includes "agents of the physician" who are present during the consultation. Gibson, 3 Wn. App. at 599. A police officer "may be deemed to be an agent of the physician, present for the

physician's protection as well as the detention of the prisoner." Gibson, 3 Wn. App. at 600. The privilege applies in criminal proceedings by virtue of RCW 10.58.010, Gibson, 3 Wn. App. at 598, and so does the nurse-patient privilege. RCW 5.62.020.

On this record, Salas's statements to the medical personnel were privileged. Salas was in the hospital to receive treatment for his injuries so he could be booked into jail. The doctor and nurse questioned him about how he sustained his arm wound. The only reasonable inference is that Salas believed the questions were being asked for the purpose of treatment. The police officer's presence during the examination did not destroy the privilege. The officer testified that he stayed in the examination room because Salas "was in custody and for security reasons; to maintain security on him." Because the officer was present for security purposes, he was an agent of the doctor and nurse. Gibson, 3 Wn. App. at 600.

There is no apparent strategic or tactical reason why counsel would decide against asserting Salas's right to patient confidentiality as a basis for suppression of his statements. "Reasonable conduct for an attorney includes carrying out the duty to research the relevant law." Kyllo, 166 Wn.2d at 862. If counsel had discovered Gibson and presented it to the trial court, the court likely would have granted the motion to suppress. Failing to cite Gibson was objectively unreasonable.

To establish prejudice, Salas must show a reasonable probability that but for counsel's deficient performance, the outcome of the proceedings would have

been different. Kyllo, 166 Wn.2d at 862. Salas argues that if the trial court had suppressed the statements, there is a reasonable probability that the jury would have either acquitted him or convicted him of manslaughter rather than murder.

The question for the jury was whether Salas acted intentionally, recklessly, or justifiably in causing Lopez's death. Even if the jury did not find self-defense, manslaughter was an option. Thus, Salas's mental state at the time of the offense was critically important. The jury's resolution of this issue depended in large part on how jurors evaluated Salas's credibility. Both men had been drinking heavily. Salas testified that he and Lopez were enjoying each other's company until Lopez grabbed at his genitals. Salas testified that he told Lopez, "I was uncomfortable, I was not ready for that step in the relationship," but Lopez persisted. Salas said he yelled at Lopez and at that point, Lopez hit him with the knife. Salas said he got the knife away from Lopez and kept it away from him during a chaotic struggle. Asked whether he thought Lopez was going to kill him, Salas said, "If he got ahold of that knife, I believe he would have."

Antonia's testimony was at odds with several aspects of Salas's narrative, most importantly when she said it appeared to her that Salas was cutting on Lopez's neck "really bad" when Lopez was already down on the floor. The physical evidence did not resolve that issue. The jury had to determine whether Antonia or Salas was the more credible witness.

It is reasonably likely that admission of Salas's statements to medical personnel influenced their finding that his stabbing of Lopez was intentional murder. Testimony that Salas "chuckled" when he told the doctor that he "killed

someone" made him seem callous. His statement to the nurse that he cut his arm on "barbed wire or a tree" conflicted with his trial testimony that he sustained the injury during his fight with Lopez and likely diminished his credibility. Because the State had to disprove self-defense beyond a reasonable doubt and Salas's version of events was not inherently inconsistent with the physical evidence, we conclude there is a reasonable probability that the outcome of the proceeding would have been different had the court suppressed his statements to medical personnel.[2]

Reversal is also warranted under the cumulative error doctrine. This doctrine applies when a combination of trial errors denies the accused a fair trial, even when any one of the errors taken individually would be harmless. In re Pers. Restraint of Cross, 180 Wn.2d 664, 678, 327 P.3d 660 (2014). "There is no prejudicial error under the cumulative error rule if the evidence is overwhelming against a defendant." Cross, 180 Wn.2d at 691.

The evidence against Salas was not overwhelming. He was denied a fair trial by the combination of the improper use of photographs in the PowerPoint presentation and trial counsel's deficient performance in the motion to suppress.

## SCOPE OF CROSS-EXAMINATION

One of the State's witnesses, a man who knew Lopez from work and socially, testified that Lopez was "a social person," "Friendly, supportive. Just liked to have a good time." When asked if he considered Lopez "flirty," the witness responded, "Yes." Salas argued that this response opened the door to

---

[2] On remand, the trial court may hear the suppression motion anew.

cross-examination of the witness about a time when Lopez allegedly acted in a "sexually aggressive" manner while intoxicated. Salas contends the court erred by barring cross-examination on this topic. We find no abuse of discretion. The witness had no firsthand knowledge of the incident.

## STATEMENT OF ADDITIONAL GROUNDS

We have considered a statement of additional grounds for review filed by Salas as permitted by RAP 10.10. They do not provide sufficient information to warrant discussion. An appellate court "will not consider a defendant's statement of additional grounds for review if it does not inform the court of the nature and occurrence of alleged errors." RAP 10.10(c).

Reversed and remanded for a new trial.

Becker, J.

WE CONCUR: